## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **v.** ) | **Case No. 21-cr-28 (APM)** |
| ) | |
| **THOMAS E. CALDWELL, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

## I.      INTRODUCTION

Thousands descended upon the U.S. Capitol building on January 6, 2021, as Congress convened to certify the Electoral College vote. Among them were the seventeen Defendants who stand before the court. All are alleged to be members of or affiliated with an organization known as the Oath Keepers. According to the Sixth Superseding Indictment, some Oath Keepers "believe that the federal government has been coopted by a cabal of elites actively trying to strip American citizens of their rights." The government contends that Defendants acted on this belief on January 6. Defendants are indicted on a host of offenses, but this opinion concerns only two: Count One charges each Defendant with conspiring to "corruptly obstruct, influence, and impede an official proceeding, that is, the Certification of the Electoral College vote," in violation of 18 U.S.C. § 1512(c)(2); and Count Two accuses each Defendant individually of violating section 1512(c)(2).

Defendants move to dismiss Counts One and Two, raising a host of arguments why those counts are fatally deficient. The court is persuaded by none of their contentions. In short, the court concludes that Counts One and Two state offenses that are encompassed by the plain text of section

1512(c)(2), and that section 1512(c)(2) is neither void for vagueness nor vague as applied to these Defendants. The charged offenses also do not run afoul of the First Amendment. Accordingly, the court denies Defendants' motions to dismiss.

## II.   BACKGROUND

### A.   The Allegations

On January 6, 2021, a Joint Session of Congress convened in the U.S. Capitol building to certify the results of the Electoral College vote of the 2020 U.S. Presidential Election. Sixth Superseding Indictment, ECF No. 513 [hereinafter Indictment], ¶ 4. The Joint Session commenced at 1:00 p.m., with Vice President Michael R. Pence, as part of his constitutional duty as President of the Senate, presiding. *Id.* ¶ 6. Crowds began to gather outside the perimeter of the Capitol building as the Joint Session began. *Id.* ¶ 7. "Crowd members eventually forced their way through, up, and over Capitol Police barricades and . . . forced entry into the Capitol building by breaking windows, ramming open doors, and assaulting Capitol Police officers." *Id.* These individuals were "not lawfully authorized to enter or remain" in the Capitol building, and none of them submitted to the requisite security and weapons screenings by Capitol Police officers. *Id.* Over the course of this hours-long siege of the Capitol, members of Congress were evacuated, dozens of law enforcement officers were injured, and "[t]he Capitol suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue from pepper spray, tear gas, and fire extinguishers." *Id.* ¶¶ 8–10.

Among those who entered the Capitol building that day are Defendants (except one),[1] all of whom are alleged to be members of or affiliated with a group known as the Oath Keepers. The Oath Keepers are "a large but loosely organized collection of individuals" and associated militias

---

[1] Defendant Thomas Caldwell alone is not alleged to have entered the Capitol building. Indictment ¶ 157.

recruited extensively from "current and former military, law enforcement, and first-responder personnel." *Id.* ¶ 11.  Some of its members "believe that the federal government has been coopted by a cabal of elites actively trying to strip American citizens of their rights." *Id.*  On January 4, 2021, the Oath Keepers' leader posted a message to the group's website exhorting members to "get to DC to stand tall in support of President Trump's fight to defeat the enemies foreign and domestic who are attempting a coup, through the massive vote fraud and related attacks on our Republic." *Id.* ¶ 12.  Defendants allegedly answered this call.

Even before this posting, Defendants began preparing for January 6.  They scheduled and attended military-style and combat trainings. *Id.* ¶¶ 41, 52.  They recruited others through social media and messaging applications, with Defendant Jessica Watkins telling one potential recruit, "[I]t is our duty as Americans to fight, kill and die for our rights." *Id.* ¶¶ 43, 47.  They collected "paramilitary gear and supplies—including firearms, camouflaged combat uniforms, tactical vests with plates, helmets, eye protection, and radio equipment[.]" *Id.* ¶ 39.  Over half of Defendants joined various encrypted Signal chats for planning purposes in the days leading up to January 6. *Id.* ¶¶ 60, 79.  That planning included having firearms at the ready, if needed.  For instance, Defendants Thomas Caldwell, Watkins, and Joshua James discussed amongst themselves and others the creation of a "quick reaction force" that would be "on standby with an arsenal" "if something goes to hell." *Id.* ¶¶ 57, 63.  The "operation" they planned and prepared for, according to the Indictment, was "to interfere with the Certification of the Electoral College vote." *Id.* ¶ 39a.  Defendant Caldwell warned in writings, "It begins for real Jan 5 and 6 on Washington D.C. when we mobilize in the streets.  Let them try to certify some crud on capitol hill with a million or more patriots in the streets.  This kettle is set to boil…." *Id.* ¶ 58 (ellipsis in original).

Defendants stand accused of carrying out their plan.  In the morning of January 6, various Defendants "prepared themselves for battle . . . by equipping themselves with communication devices and donning reinforced vests, helmets, and goggles."  *Id.* ¶ 107.  That afternoon, when news of individuals breaching the Capitol spread, Defendant James instructed Defendants in his group—including Defendants Roberto Minuta and Brian Ulrich—"to get their gear and get ready to head to the Capitol."  *Id.* ¶ 128.  Defendant Minuta "donned battle apparel and gear, including hard-knuckle tactical gloves, ballistic goggles, [and] a tactical vest" and also brought along "a radio with an ear piece, and bear spray."  *Id.*  Others likewise wore tactical gear.  *Id.*  This group of Defendants—who were joined by Defendant Jonathan Walden—raced to the Capitol building in two golf carts.  *Id.* ¶ 137.  Defendant Minuta said during the ride: "Patriots storming the Capitol building . . . fucking war in the streets right now . . . word is they got in the building . . . let's go."  *Id.*

Meanwhile, eleven other Defendants entered the Capitol grounds around 2:22 p.m.  *Id.* ¶ 130.  They formed a "stack of individuals wearing Oath Keepers clothing, patches, insignia, and battle gear."  *Id.* ¶ 141.  The members of the "Stack" kept one hand on the shoulder of the member in front of them and maneuvered through the crowd and up the east Capitol steps.  *Id.* ¶¶ 138, 141.  They successfully entered the Capitol Rotunda.  *Id.* ¶ 147.  Some, including Defendants Watkins, Donovan Crowl, Sandra Parker, and Laura Steele, attempted to move into the Senate wing of Congress.  *Id.* ¶ 151.  They, along with Defendants William Issacs and James Beeks, joined a confrontation against "a line of riot police officers guarding the hallway connecting the Rotunda to the Senate."  *Id.* ¶¶ 143–153.  Defendant Watkins commanded the crowd to "push" and "get in there" before they were rebuffed by the officers' use of chemical spray.  *Id.* ¶¶ 153–154.  Other

members of the Stack went in a different direction. Defendants Kelly Meggs, Connie Meggs, Harrelson, Joseph Hackett, and David Moerschel walked toward the House side. *Id.* ¶ 156.

Defendants Minuta, James, and Walden, armed with Minuta's bear spray and tactical gear and accompanied by Walden's 82-pound German Shepherd named "Warrior," entered the Capitol about a half hour after the Stack. *Id.* ¶¶ 129, 163–164. Once inside, Defendant James grabbed one Metropolitan Police Department officer by his vest and pulled him toward the mob, yelling "Get out of my Capitol! This is my fucking building! This is not yours! This is my Capitol!" *Id.* ¶ 166. Defendant Minuta stood beside James and yelled, "This is what's bound to happen, just get out! Get out! Get these cops out! It's our fucking building! Get 'em out, get out!" *Id.* ¶ 167.

All Defendants (except Defendant Caldwell, who never entered in the first place, *see supra* note 1) eventually left the Capitol building. Thirteen of them gathered afterwards approximately 100 feet from the Capitol building. *Id.* ¶ 178.

### B.     Procedural Background

Defendants are charged by indictment with multiple felony and misdemeanor counts. *See generally* Indictment. Only two of those counts are relevant to this opinion. Count One charges all seventeen Defendants with conspiracy to "commit an offense against the United States, namely, to corruptly obstruct, influence, and impede an official proceeding, that is the Certification of the Electoral College vote, in violation of Title 18, United States Code, Section 1512(c)(2)." Indictment ¶ 37. Count Two charges each Defendant individually with a violation of section 1512(c)(2). *Id.* ¶ 180.

Defendant Caldwell was the first to file a motion to dismiss on June 15, 2021. Caldwell Mot. for Dismissal of Indictment, ECF No. 240 [hereinafter Caldwell MTD]. Defendants James and Harrelson next moved for dismissal on July 1, 2021, James's Mot. to Dismiss Count 8 &

Portions of Count 13 of the Indictment, ECF No. 269; Harrelson's Mot. to Dismiss, ECF No. 278 [hereinafter Harrelson MTD], followed by Defendant Crowl on July 5, 2021, Mot. to Dismiss Counts One & Two, ECF No. 288 [hereinafter Crowl MTD]; Crowl's Second Mot. to Dismiss Counts I & II & for Disclosure of Grand Jury Minutes, ECF No. 382.  Defendant Connie Meggs likewise filed a motion to dismiss on September 2, 2021.  Def. Connie Meggs' Mot. to Dismiss, ECF No. 386 [hereinafter Connie Meggs MTD].  Each Defendant has joined in all, or nearly all, of these motions.  *See* Omnibus Order, ECF No. 415 [hereinafter Omnibus Order], at 1 nn.1–5.

The court held oral argument on Defendants' motions on September 8, 2021.  Hr'g Tr., ECF No. 414.  Following the hearing, the court largely rejected Defendants' motions as they related to counts other than Counts One and Two.  *See* Omnibus Order.  The court requested additional briefing as to those two counts.  Hr'g Tr. at 106.  The government filed its supplemental brief on September 22, 2021.  Gov't's Suppl. Br. on 18 U.S.C. § 1512(c)(2), ECF No. 437 [hereinafter Gov't's Suppl. Br.].  Defendants Ulrich, Caldwell, Connie Meggs, Crowl, Harrelson, and Beeks followed with additional briefs responding to the government's filing.[2]

## III.  LEGAL STANDARD

The Federal Rules of Criminal Procedure state that an indictment is only required to contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  A defendant may move to dismiss an indictment or specific counts thereof for "failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v).  Because pretrial dismissal of an indictment "directly encroaches upon the fundamental role of the grand jury,

---

[2] *See* Def. Brian Ulrich's Suppl. Br. on 18 U.S.C. § 1512(c)(2), ECF No. 450 [hereinafter Ulrich Suppl. Br.]; Def. Caldwell's Reply to Gov't's Suppl. Br. on 18 U.S.C. § 1512(c)(2), ECF No. 453; Suppl. Br. in Supp. of Def. Connie Meggs's Mot. to Dismiss Counts I & II of the Indictment, ECF No. 454 [hereinafter Connie Meggs Suppl. Br.]; Def. Crowl's Resp. to the Gov't's Suppl. Br. on 18 U.S.C. § 1512(c)(2), ECF No. 455 [hereinafter Crowl Suppl. Br.]; Def. Kenneth Harrelson's Reply to Gov't's Suppl. Br. on 18 U.S.C. § 1512(c)(2), ECF No. 465 [hereinafter Harrelson MTD]; Def. James Beeks's Suppl. Br. in Supp. of the Mots. to Dismiss Counts One & Two of the Sixth Superseding Indictment, ECF No. 554 [hereinafter Beeks Suppl. Br.].

dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F. 3d 138, 148 (D.C. Cir. 2015) (internal quotation marks omitted). In evaluating a motion to dismiss, the court must assume "the truth of . . . factual allegations" in the indictment. *Id.* at 149. The court's review of an indictment "is limited to reviewing the *face* of the indictment, and more specifically, the *language used* to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 59–60 (D.D.C. 2009) (internal quotation marks omitted). The ultimate question the court must answer is "whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).

## IV. DISCUSSION

Section 1512(c)(2) of Title 18 provides that "[w]hoever corruptly . . . or . . . otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1512(c)(2). As noted, Count One of the Indictment charges all Defendants with a conspiracy to violate 18 U.S.C. § 1512(c)(2) and Count Two charges each Defendant with a substantive violation of that statute. The indictment alleges that the Joint Session of Congress that convened on January 6 to certify the Electoral College vote was the "official proceeding" that Defendants obstructed, influenced, or impeded. Defendants' purpose was to "stop, delay, and hinder the Certification of the Electoral College vote," Indictment ¶ 38, and each Defendant "attempted to, and did, corruptly obstruct, influence, and impede . . . the Certification of the Electoral College vote," and aided and abetted others to do the same, *id.* ¶ 180.

Defendants' challenges to Counts One and Two fall into three categories: (1) the Indictment fails to allege facts to support certain elements of section 1512(c)(2); (2) section 1512(c)(2) is unconstitutionally vague because it failed to give Defendants fair notice of the

7

conduct it prohibits; and (3) section 1512(c)(2) as applied to these Defendants violates the First Amendment. In the first category, Defendants maintain that (a) the Certification of the Electoral College vote does not qualify as an "official proceeding" and (b) attempting to "stop, delay, and hinder the Certification of the Electoral College vote" does not state an offense under section 1512(c)(2) because the statute reaches only obstructive acts that affect the integrity or availability of evidence, which the Indictment does not allege. In the second category, Defendants assert that (a) the term "official proceeding" is unconstitutionally vague if applied to the Certification of the Electoral College vote and (b) so too is the statute's *mens rea*, or state-of-mind, element "corruptly." The court addresses these first two categories of arguments below by element, starting with "official proceeding," then addressing the term "corruptly," and concluding with "obstruct, influence, and impede." The opinion ends with a discussion of Defendants' First Amendment as-applied challenge.[3]

### A.   Arguments Relating to Congress's Certification of the Electoral College Vote as an "Official Proceeding"

> #### 1.   Congress's Certification of the Electoral College vote qualifies as an "Official Proceeding"

The court begins with Defendants' contention that Counts One and Two fail to state an offense because the Certification of the Electoral College vote does not qualify as an "official proceeding." Caldwell MTD at 3–14; Harrelson MTD at 11–14. The term "official proceeding" is statutorily defined. As relevant here, it means "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). A straightforward reading of that definition easily reaches the Certification of the Electoral College vote. The Certification was "a proceeding." *See United States v. Ermoian*,

---

[3] The court has not specifically cited in this opinion to Judge Friedrich's decision in *United States v. Sandlin*, No. 21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021), which rejects many of the same arguments that Defendants make here. Instead of citing to *Sandlin*, the court simply notes its agreement with Judge Friedrich's holdings and finds her reasoning for those holdings to be persuasive.

752 F.3d 1165, 1169 (9th Cir. 2013) (holding that "the legal—rather than the lay—understanding of [the] term 'proceeding' is implicated in the statute" (citing *Proceeding,* BLACK'S LAW DICTIONARY (8th ed. 2004) (defining the term to mean, among other things, "[t]he business conducted by a court *or other official body*" (emphasis added)))).  And it took place "before the Congress."  Congress jointly convened on January 6 to open, potentially debate, and count the Electoral College votes.  *See* U.S. Const. art. II, § I, cl. 3; U.S. Const. amend. XII; 3 U.S.C. §§ 15– 18.  The Vice President presided over the Joint Session.  Indictment ¶ 6.  And Congress had started to carry out its constitutional and statutory duties before Defendants and others entered the Capitol building.  *Id.* ¶ 8.  This was the "business" of an "official body" on January 6.  The Certification of the Electoral College vote thus meets the definition of an "official proceeding."

Defendants ask the court to eschew this straightforward reading.  According to Defendant Caldwell, "official proceeding" must be interpreted to mean only those proceedings that "are *adjudicatory or inquisitive in nature*, requiring investigations, due process, sworn testimony, and document production."  Caldwell MTD at 7.  Among other arguments, he points to section 1512's title ("Tampering with a witness, victim, or an informant") and its words indicating "court-like proceedings" ("testimony," "record," "document," "legal process," "summoning," etc.) as support for his narrower reading.  *Id.* at 6–7.  Defendants Harrelson and Connie Meggs take a slightly different tack.  They contend that, in the context of a congressional proceeding, only proceedings involving the "exercise [of] Congress's implied power of investigation in aid of legislation" qualify as official proceedings for purposes of prosecutions under section 1512.  Harrelson MTD at 12; *see also* Connie Meggs MTD at 9 ("[A]ny proceeding of the Congress lacking a 'legislative purpose' is not an official proceeding and therefore not covered by section 1512(c)(2).").  Like

Caldwell, they contend that the "text and structure" of "Chapter 73 of title 18" support their position.  Harrelson MTD at 13.

These arguments do not withstand scrutiny.  Had Congress wished to criminalize under section 1512 only those acts that obstruct its adjudicatory, investigative, or legislative proceedings, it had a ready-made template for how to do so.  A different nearby provision, section 1505, makes it unlawful to obstruct "the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress."  18 U.S.C. § 1505.  Section 1505 thus prohibits obstructive acts directed at a particular type of congressional proceeding:  those involving the "power of inquiry."  This provision has been part of the U.S. Code since at least 1962.  *See* Antitrust Civil Process Act, Pub. L. No. 87-664, sec. 6(a), § 1505, 76 Stat. 548, 551 (1962).  But Congress did not select this narrow construct when it enacted section 1512(c) as part of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, sec. 1102, § 1512, 116 Stat. 745, 807.  Instead, it used the preexisting definition of "official proceeding," first adopted in 1982, which does not distinguish between particular types of congressional proceedings or functions of Congress.  Victim and Witness Protection Act of 1982, Pub. L. No. 97-291, sec. 4, § 1515(1), 96 Stat. 1248, 1252 ("a proceeding before the Congress").  The court must presume that Congress understood the prevailing statutory landscape when enacting section 1512(c).  *See Garrett v. United States*, 471 U.S. 773, 793–94 (1985).  That Congress decided to incorporate into section 1512(c) an existing definition of "official proceeding" that broadly includes "a proceeding before Congress," as opposed to one limited to its "power of inquiry," is therefore consequential.  *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in

the disparate inclusion or exclusion." (alteration in original) (internal quotation marks omitted)). It means that Congress did not intend to limit the congressional proceedings protected under section 1512(c) to only those involving its adjudicatory, investigative, or legislative functions. And the court will not add a requirement to the statute that Congress did not see fit to include.

Statutory context does not compel a different result.  The title of section 1512 ("Tampering with a witness, victim, or an informant") concededly references terms ("witness," "victim," "informant") that are not naturally associated with the Certification of the Electoral College vote, but "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947); *id.* at 528 (stating that a "heading is but a short-hand reference to the general subject matter involved. . . . [and] not meant to take the place of the detailed provisions of the text").  Similarly, it is true that section 1512 contains terms normally linked to a "court-like proceeding," Caldwell MTD at 7, but none of those terms appear in section 1512(c)(2), which contain broad prohibitions against corruptly "obstruct[ing]," "influenc[ing]," and "imped[ing]."  Those terms can be readily applied to a formal congressional proceeding, like the Certification, that is neither adjudicatory nor investigatory in purpose.

Defendants also contend that the U.S. Code uses other terms that more aptly encompass the Certification of the Electoral College vote than does the term "official proceeding."  Caldwell MTD at 11.  For instance, section 231(a)(3), appearing under the title "Civil disorders," prohibits acts that "obstruct, impede, or interfere with any . . . law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects . . . the conduct or performance of any *federally protected function*."  18 U.S.C. § 231(a)(3) (emphasis added). Multiple Defendants in this case are charged with that offense.  *See* Indictment ¶¶ 185–190.  Also,

another code provision, 40 U.S.C. § 5104(e)(2), makes it a misdemeanor offense "to enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of . . . either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress" if done "with the intent to disrupt the *orderly conduct of official business*." 40 U.S.C. § 5104(e)(2) (emphasis added.)    Defendants take from these provisions that an "'official proceeding before the Congress'" is "clearly" "a smaller subset of congressional activities than 'federally protected function[s]' and Congress's 'official business.'"    Caldwell MTD at 11 (first quoting 18 U.S.C. § 1512(c)(2); then quoting 18 U.S.C. § 231(a)(3); and then quoting 40 U.S.C. § 5104(e)(2)).

But even if that is true, it does not follow that the Certification is not an "official proceeding" for purposes of section 1512(c)(2).  "Federally protected function," as defined, does not appear to reach the acts of Congress.  *See* 18 U.S.C. § 232(3) (defining "federally protected function" to mean "any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States").  As for the term "official business," it is broader than the term "a proceeding before the Congress," but it does not necessarily follow that the Certification cannot be an "official proceeding" if it also qualifies as "official business"—after all, "[s]ome overlap in criminal provisions is . . . inevitable." *Marinello v. United States*, 584 U.S. __, __, 138 S. Ct. 1101, 1107 (2018).  Defendants implicitly concede as much.  Even under their preferred construction of "official proceeding," an investigative hearing or an impeachment trial would qualify.  Yet, they offer no principled reason why obstruction of such proceedings would be chargeable under 1512(c)(2) but the Certification is not even though both plainly qualify as the "official business" of Congress.

Nor do the various circuit court decisions on which Defendants rely help their cause. Defendants place heavy reliance on *United States v. Ermoian*, 752 F.3d 1165, 1170–72 (9th Cir. 2013), and *United States v. Ramos*, 537 F.3d 439, 462–63 (5th Cir. 2008), in which the courts, respectively, held that neither an FBI investigation nor an internal Customs and Border Patrol investigation are an "official proceeding" under a different definitional clause: "a proceeding before a Federal Government agency which is authorized by law," 18 U.S.C. § 1515(a)(1)(C). *See also United States v. Binette*, 828 F. Supp. 2d 402, 403–04 (D. Mass. 2011) (holding that a "preliminary" SEC investigation does not constitute an "official proceeding"). In so holding, those courts emphasized that the term "official" "indicates a sense of formality normally associated with legal proceedings," *Ermoian*, 752 F.3d at 1170, and that the use of the preposition "before" in section 1515(a)(1)(C) "implies that an 'official proceeding' involves some formal convocation of the agency in which parties are directed to appear," *Ramos*, 537 F.3d at 462–63. Investigations lacked those features, the courts concluded. *Ermoian*, 752 F.3d at 1170–72; *Ramos*, 537 F.3d at 462–63.

To state the obvious, neither of those cases touched on the question of whether "a proceeding before Congress" should be construed narrowly to encompass only a subspecies of congressional proceeding. But even by their logic, the Certification of the Electoral College vote exudes "formality" and involves a "formal convocation" of Congress. *See* 3 U.S.C. §§ 15–16 (setting forth in detail the process and procedures for counting and certifying the votes). It bears none of the features that the courts in *Ermoian* and *Ramos* found wanting with respect to mere investigations. *Cf. United States v. Kelly*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (observing that a "mere police investigation" is not a "proceeding" but holding that an Inspector General inquiry

that involved the issuance of subpoenas and compelled sworn testimony did qualify as an "official proceeding").

Defendants also seek support for their interpretation in the Department of Justice's Criminal Resource Manual.  Caldwell MTD at 12.  A cited portion of the Manual states that section 1512 "proscribes conduct intended to illegitimately affect *the presentation of evidence* in Federal proceedings or the communication of information to Federal law enforcement officers."  *1729. Protection of Government Processes – Tampering with Victims, Witnesses, or Informants – 18 U.S.C. 1512*, Dep't Just. Archives, https://www.justice.gov/archives/jm/criminal-resource-manual-1729-protection-government-processes-tampering-victims-witnesses-or (last updated Jan. 17, 2020) (emphasis added).  Another cited portion states that the definition of "official proceeding" in section 1515 "is[,] in large part, a restatement of the judicial interpretation of the word 'proceeding' in §§ 1503 and 1505" but closes a loophole under those sections that required a proceeding to be pending, whereas section 1515 does away with that requirement.  *1730. Protection of Government Processes – "Official Proceeding" Requirement – 18 U.S.C. 1512*, Dep't Just. Archives, https://www.justice.gov/archives/jm/criminal-resource-manual-1730-protection-government-processes-official-proceeding-requirement (last updated Jan. 17, 2020). Grasping onto these observations, Defendants "agree[] with the DOJ's interpretation of § 1512 as a tool to protect the integrity of *evidence*" and further "agree[] . . . that the term 'proceeding' in § 1512 has a comparable meaning in § 1505, where it clearly referred to Congress's investigations and inquiries."  Caldwell MTD at 13.  But Defendants' reliance on the Manual is flawed for two reasons.  For one, the Manual predates the enactment of section 1512(c)—the Manual was last published in 1997, *see* Gov't's Omnibus Opp'n to Defs.' Mot. to Dismiss & for Bill of Particulars, ECF No. 313, at 15–16—and therefore sheds no light on the scope of the code provision at issue

here. And, second, the Manual's generalized statements cannot alter the plain meaning of the statutory text. The Certification is plainly a "proceeding before the Congress," and the Manual supplies no reason to deviate from that plain-text construction. An "official proceeding" is not limited to only those that are adjudicatory or inquisitory in nature.

In the alternative, the court holds that, even if it were to accept Defendants' reading that an "official proceeding" must be in some sense "adjudicatory," Caldwell MTD at 7, the Certification of the Electoral College vote so qualifies. To "adjudicate" means "to make an official decision about who is right in (a dispute)." *Adjudicate*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/adjudicatory (last visited Dec. 16, 2021). As we all now know, disputes can arise during the Certification. Members of Congress can object to the votes in writing and must state "clearly and concisely, and without argument, the ground" of their objection. 3 U.S.C. § 15. Each chamber then "withdraw[s]" to consider and make a "decision" as to the objection. *Id.* In a rare instance, "the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified." *Id.* The joint meeting of Congress cannot be "dissolved until the count of electoral votes shall be completed and the result declared." *Id.* § 16.

Historically, the Certification has proceeded largely without controversy, but not so for the 2020 presidential election. When crowds began to enter the Capitol on January 6, Congress had "withdrawn to [their] separate chambers to resolve an objection." Indictment ¶ 8. That is, each House was engaged in a proceeding "to make an official decision about" disputed Electoral votes. Thus, it is inaccurate to characterize the Certification that occurred on January 6 as a "purely ministerial, legislative vote-counting event." Caldwell MTD at 10. Even under Defendants'

narrower reading, it was an "adjudicatory" proceeding and therefore an "official proceeding" for purposes of section 1512(c)(2).

> ###### 2. The definition of "Official Proceeding" is not vague as applied to Defendants

Defendants next contend that if, as the court has held, the definition of "official proceeding" is understood to include the Certification of the Electoral College vote, the definition of that term is vague as applied to them. Harrelson MTD at 14–18. They argue that "§ 1512(c)(2) has never been used to prosecute a defendant for the obstruction of an 'official proceeding' unrelated to the administration of justice, i.e., a proceeding not charged with hearing evidence and making factual findings." *Id.* at 15. They add: "[T]here is no notice, much less fair notice, in § 1512(c)(2) or in any statute in Chapter 73 that a person may be held criminally liable for interference with a proceeding that does not resemble a legal tribunal." *Id.* They complain of both general and specific arbitrariness of this prosecution, *id.* at 17: general arbitrariness in the sense that, "prior to January 6, [the government] had never prosecuted a violation of that statute by alleging obstruction of a congressional proceeding that was not held pursuant to Congress's investigatory power," and specific in the sense that hundreds have been charged in connection with the events of January 6, but only some have been charged with a violation of section 1512(c)(2), with no apparent principled distinction between the two groups. *Id.* at 17–18. Counts One and Two, they insist, therefore must be dismissed for lack of due process.

"A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "Fair notice" generally requires only that the legislature "enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself

16

with its terms and to comply." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (internal quotation marks omitted) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). Whether a statue is vague as applied focuses on the acts of the individual challenging it. *See Williams*, 553 U.S. at 304.  A person "who engages in some conduct that is clearly proscribed cannot complain of vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982).  The vagueness inquiry "turns on the tools of statutory interpretation." *Bronstein*, 849 F.3d at 1104.  Applying such tools, statutory vagueness will be rare:  a statute is unconstitutionally vague only if, "applying the rules for interpreting legal texts, its meaning 'specifie[s]' 'no standard of conduct . . . at all.'" *Id.* (alterations in original) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).

Here, the definition of "official proceeding" presents no vagueness problem.  Section 1515(a)(1) defines "official proceeding" to include "a proceeding before the Congress."  "[T]he plain, obvious and common sense" meaning of that definition, as already discussed, reaches the Certification of the Electoral College vote, and the statutory "context furnishes [no] ground" to "control" or "qualify" it. *Bronstein*, 849 F.3d at 1108 (internal quotation marks omitted).  The fact that this case may be a first-of-its-kind prosecution does not render the term "official proceeding" vague as applied.  If that were the case, countless initial prosecutions under new criminal statutes would be constitutionally deficient.   "Fair notice" rests instead on whether the statute itself "provides a discernable standard when legally construed."  *Id.* at 1107.  Section 1515(a)(1)(B) does so.

Nor can the court identify any vagueness problem from the fact that other January 6 defendants have not been charged under section 1512(c)(2).  Discretionary prosecutorial decisions cannot render vague as applied a statute that by its plain terms provides fair notice.

17

### B.      The Term "Corruptly" Is Not Fatally Vague

Defendants next take aim at a different element of proof under section 1512(c)(2): "corruptly."   The statute makes it unlawful to "corruptly . . . obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so."   18 U.S.C. § 1512(c)(2).   Counts One and Two charge Defendants with acting "corruptly."   Indictment ¶¶ 37, 180.   Relying on the D.C. Circuit's decision in *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), Defendants assert that the term "corruptly" is fatally vague.   Harrelson MTD at 18–20; Crowl MTD at 11–13.   Their argument is that because the court in *Poindexter* found the term "corruptly" to be vague as applied to the defendant there, so it is here, too.   *See id.*   The court disagrees.[4]   To explain the disagreement requires an extensive discussion of *Poindexter* and its aftermath.

*Poindexter* involved the prosecution of Admiral John Poindexter for his role in the Iran-Contra Affair, during which he served as National Security Advisor.   951 F.2d at 370.   A jury convicted Poindexter for, among other things, violating 18 U.S.C. § 1505 by lying to or misleading Congress.   *Id.*   The portion of section 1505 at issue there provides: "Whoever corruptly . . . influences, obstructs, or impedes or endeavors to influence, obstruct, or impede . . . the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House . . ." shall be fined or imprisoned.   18 U.S.C. § 1505.   Poindexter challenged his convictions on the ground that "use of the term 'corruptly' renders the statute unconstitutionally vague as applied to his conduct."   *Poindexter*, 951 F.2d at 377.   The court agreed with him.   It held that "the term 'corruptly' is too vague to provide constitutionally adequate notice that it prohibits lying to the Congress."   *Id.* at 379.

---

[4] Defendants are less than clear on whether they mean to argue that "corruptly" is facially vague or vague as applied, that is, whether "corruptly" is vague "in all [its] applications," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 14 (2010), or only vague as applied to them.   *See* Crowl MTD at 2 (arguing that the term "corruptly" is "void for vagueness, facially and as applied").   Either way, the court rejects the vagueness challenge.

The court began by observing that "the word 'corruptly' is vague" and that, "in the absence of some narrowing gloss, people must 'guess at its meaning and differ as to its application.'"  *Id.* at 378.  And, importantly, the court said, the term "corruptly influencing" "a congressional inquiry does not at all clearly encompass lying to the Congress."  *Id.*  The court then looked at both the statutory text and legislative history for a narrowing construction.  With respect to the text, the court observed that the "the adverbial form 'corruptly' may have either [a] transitive or . . . intransitive sense"—transitive in the sense of a person acting to corrupt another or intransitive in the sense of a person acting corruptly.  *Id.* at 379.  The court concluded that "§ 1505 favors the transitive reading."  *Id.*  It added that, under either a transitive or intransitive reading, the word could not be rescued from being constitutionally infirm absent "more specific content." *Id.*  The court also found the legislative history not to be clarifying.  That history gave no indication that Congress made "criminal a witness' violation of his own legal duty or 'in any way restrict[ed] the rights of any witness appearing before any committee of the Congress.'"  *Id.* at 382 (citation omitted).  It also suggested that "corruption is something more specific than simply any immoral method used to influence a proceeding."  *Id.* (internal quotation marks omitted).  "On balance," the court concluded, "the legislative history seems to support the transitive interpretation of 'corruptly' in § 1505," but in no event did the legislative history do any better than the statutory text in providing notice that the statute reached lying to or misleading Congress.  *Id.* at 384–85.  In the end, the court did not conclude that "corruptly" in section 1505 was "unconstitutionally vague as applied to all conduct."  *Id.* at 385.  It acknowledged that there might be narrower interpretations of the term—including influencing another person to violate a legal duty or acting to obtain an improper advantage for oneself or another—that could pass muster.  *Id.* at 385–86.  It held, "[e]ven if that statute may constitutionally be applied to all attempts to influence or to obstruct a

congressional inquiry by influencing another to violate his legal duty, it would still not cover the conduct at issue on this appeal—making false and misleading statements to the Congress." *Id.* at 386.

Much has transpired in the four decades that have passed since *Poindexter*. Most significantly, not long after the decision, Congress acted to reverse it. In 1996, Congress added a definition of the term "corruptly" to section 1515. False Statements Accountability Act, Pub. L. 104–292, § 3, 110 Stat. 3460 (1996). Section 1515(b) now provides: "As used in section 1505, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." 18 U.S.C. § 1505(b). By defining "corruptly" to mean acting "personally or by influencing another" Congress left no doubt that it intended for the term to be used both in the transitive and intransitive sense, thereby refuting the underlying rationale of *Poindexter*.

In addition, courts of appeal since *Poindexter* have refused to extend its holding to other obstruction provisions. *See, e.g., United States v. Edwards*, 869 F.3d 490, 502 (9th Cir. 2017) (refusing to apply *Poindexter* to section 1512(b) and observing that, "[b]ased on the narrow reasoning used in *Poindexter*, other courts have cabined that vagueness holding to its unusual circumstances"); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) ("We . . . decline to extend *Poindexter* to another section of the obstruction-of-justice statutes. We continue to believe that *Poindexter* must be read narrowly, and not as a broad indictment of the use of 'corruptly' in the various obstruction-of-justice statutes."); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) ("The holding of unconstitutionality was closely tied to the alleged illegal conduct by *Poindexter* and the unique nature of § 1505."); *United States v. Church*,

11 F. App'x 264, 268 (4th Cir. 2001) (refusing to extend *Poindexter* to section 1517).  Indeed, the circuit courts consistently have held that the term "corruptly" as it appears in section 1512 is *not* unconstitutionally vague.  *See, e.g., Edwards*, 869 F.3d at 501–02; *Shotts*, 145 F.3d at 1300; *United States v. Thompson*, 76 F.3d 442, 452–53 (2d Cir. 1996).  The D.C. Circuit is among them. In *United States v. Morrison*, the court held that, "[w]hile we agree that [sections 1505 and section 1512(b)] are sufficiently similar to support a 'transitive' reading of the word 'corruptly' in § 1512(b), we disagree with Morrison's claim that his conduct could not still fall under the statutory ban."  98 F.3d 619, 630 (D.C. Cir. 1996).  The court had no problem finding that "corruptly" was not vague as to the defendant's efforts to "corrupt" another "by exhorting her to violate her legal duty to testify truthfully in court." *Id.*  Thus, every circuit court to have considered *Poindexter* has cabined it to its facts, and no court of appeals, including the D.C. Circuit, has read *Poindexter* to mean, as Defendants seem to urge, that the term "corruptly" in any obstruction statute is fatally vague.  To the contrary, courts uniformly have held that the term "corruptly" as used in section 1512(c)'s neighboring subparagraph, section 1512(b), is neither void for vagueness nor vague as applied.

Since *Poindexter*, the Supreme Court has also weighed in.  The Court in *Arthur Andersen LLP v. United States* held that the jury instructions in that case "failed to convey the requisite consciousness of wrongdoing" required for a conviction under section 1512(b)(2).  544 U.S. 696, 706 (2005).  The relevant portion of 1512(b) makes it unlawful to "knowingly . . . corruptly persuade[] another person . . . with intent to . . . cause" that person to "withhold" or "alter" documents "for use in an official proceeding."  18 U.S.C. § 1512(b).  The Court found the instructions to be so "diluted" that the meaning of "corruptly" "covered innocent conduct." *Arthur Andersen*, 544 U.S. at 706.  In so holding, the Court interpreted both "knowingly" and "corruptly."

"Knowledge" and "knowingly," the Court said, are "normally associated with awareness, understanding, or consciousness," and "corrupt" and "corruptly" "are normally associated with wrongful, immoral, depraved, or evil." *Id.* at 705. Taken together, "[o]nly persons conscious of wrongdoing can be said to 'knowingly . . . corruptly persuad[e].'" *Id.* at 706. "[L]imiting criminality to persuaders conscious of their wrongdoing," said the Court, "sensibly allows § 1512(b) to reach only those with the level of 'culpability . . . we usually require in order to impose criminal liability.'" *Id.* (quoting *United States v. Aguilar*, 515 U.S. 593, 602 (1995)). Nowhere in its discussion of the words "knowingly" and "corruptly" did the Court even hint that those words, either alone or together, were too vague to provide fair notice. *See Edwards*, 869 F.3d at 502.

With this background in mind, the court explains why this case is not controlled by *Poindexter*. Unlike section 1515 at the time of *Poindexter*, the term "corruptly" in section 1512(c) must be read in the intransitive sense—that is, the person must act "corruptly" to violate section 1512(c)(2). That is plain from section 1512(c)(1), which prohibits corrupt acts with respect to a "record, document, or other object" "with the intent to impair the object's integrity or availability for use in an official proceeding." 18 U.S.C. § 1521(c)(1). Corruption of another is not required to violate 1512(c)(1). Indeed, the purpose of enacting section 1512(c) was to close a loophole in the pre-*Arthur Andersen* law that only made it an offense under section 1512(b) to "intimidat[e], threate[n], or corruptly persuad[e] *another person*" to shred documents. *Yates v. United States*, 574 U.S. 528, 536 (2015); *See* S. Rep. No. 107-146, at 6–7 (2002) (referencing the "legal fiction" in *Arthur Andersen* that the defendants were "being prosecuted for telling other people to shred documents, not simply for destroying evidence themselves"); *cf. Yates*, 574 U.S. at 535–36 (2015) (discussing *Arthur Anderson* and the loophole in existing law leading to Congress's passage of section 1519). That reading must similarly extend to a prosecution under 1512(c)(2): the term

"corruptly" applies equally to subsections (c)(1) and (c)(2).  The term thus must be understood in its intransitive form with regard to these Defendants.[5]  Accordingly, the concern that animated *Poindexter*—that a transitive reading of corruptly under section 1505 did not reach the making of false statements to Congress—is simply not present in this prosecution under section 1512(c)(2).

*Arthur Andersen* also ameliorates any lingering concerns about the vagueness of "corruptly."  *See Edwards*, 869 F.3d at 502.  To be sure, the issue of vagueness was not squarely presented in that case.  But it is notable that the Supreme Court there relied on common definitions of "knowingly" and "corruptly" to proscribe the *mens rea* element of section 1512(b)(2).  Circuit courts had done so prior to *Arthur Andersen*.  *See, e.g.*, *Thompson*, 76 F.3d at 452 (interpreting "corruptly" for purposes of section 1512(b)(2) to mean "motivated by an improper purpose"); *accord Shotts*, 145 F.3d at 1300.  This court does the same here.

Doing so results in a definition of "corruptly" that, at the very least, requires Defendants to have acted with consciousness of wrongdoing.  *See Arthur Andersen*, 544 U.S. at 706.  The government agrees with that definition.  *See* Gov't's Suppl. Br. at 15 ("That the term 'corruptly' requires the government to prove that a defendant acted not only with intent to obstruct but also with 'consciousness of wrongdoing' ensures that Section 1512(c)(2) 'reaches only' those who have committed felony obstruction.").  The court need not adopt a firm definition of "corruptly" at this point.  Courts have approved various formulations of the term.  *See, e.g.*, *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (defining "corruptly" under section 1512(c) to mean "with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct the [official proceeding]" (internal quotation marks omitted));

---

[5] For this reason, the court also rejects Defendant Connie Meggs's contention that the Indictment fails to allege corrupt intent because "there is no allegation that either the co-conspirators or Ms. Meggs sought to corruptly influence any other persons."  Connie Meggs MTD at 9.  Unlike section 1512(b), section 1512(c)(2) on its face does not require a defendant to have acted corruptly with respect to "another person," 18 U.S.C. § 1512(b).

*United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (adopting Eleventh Circuit's definition); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (approving jury instruction defining "corruptly" to mean "consciousness of wrongdoing"); *cf. United States v. Edlind*, 887 F.3d 166, 173 n.3 (4th Cir. 2018) (noting in prosecution under section 1512(c)(1) that the trial court had instructed the jury that "it could convict only if [the defendant] 'acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice,' and was 'conscious of wrongdoing'").   It suffices for present purposes to say that to prove that Defendants acted "corruptly," the government, at least, will have to show that they acted with consciousness of their wrongdoing.   So defined, the term "corruptly" is not unconstitutionally vague.

Defining "corruptly" in this way also substantially mitigates, if not resolves altogether, Defendants' vagueness challenges to section 1512(c)(2) as a whole.   The Supreme Court "has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*."   *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). Criminal statutes that lack a scienter requirement, the Court has held, present "a trap for those who act in good faith."   *United States v. Ragen*, 314 U.S. 513, 524 (1942).   On the other hand, where a statute requires as an element of conviction that the defendant possessed a specific intent, the statute "gives a person acting with reference to the statute fair warning that his conduct is within its prohibition."   *Screws v. United States*, 325 U.S. 91, 104 (1945).   "One who does act with such specific intent is aware that what he does is precisely that which the statute forbids.   He is under no necessity of guessing whether the statute applies to him."   *Id.*   Here, Defendants cannot complain that section 1512(c)(2) does not supply fair notice if it is construed to require proof that Defendants acted with a specific intent to do what the statute prohibits:   obstruct an official

proceeding.  Again, the court need not decide the precise contours of what the government must prove at this stage.  For now, it is sufficient to say that interpreting section 1512(c)(2) to contain a stringent specific intent *mens rea* requirement shields it from unconstitutional vagueness.

### C.   Defendants' Alleged Conduct Falls Within the Prohibitions of Section 1512(c)(2)

The court now arrives at the most substantial of Defendants' challenges:  that Counts One and Two fail to allege conduct that is prohibited by section 1512(c)(2).  In so arguing, Defendants urge the court to adopt a narrow construction of section 1512(c)(2), one that defies its "expansive language."  *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).  Defendants contend that a proper reading of section 1512(c)(2) prohibits "only conduct intended to generate false testimony, impede the testimony of witnesses, or impair the collection of evidence in some fashion."  Crowl MTD at 9.  Stated differently, the statute proscribes only acts that "intentionally affect the integrity or availability of evidence in a proceeding."  Crowl Suppl. Br. at 4; *see also* Ulrich Suppl. Br. at 3–6 (arguing that section 1512(c)(2) "requires some nexus to tangible evidence").  After careful consideration of this question, the court holds that the actions made unlawful by section 1512(c)(2) are not limited to those "affect[ing] the integrity or availability of evidence in a proceeding" and that Counts One and Two state an offense against these Defendants.

The court begins, as it must, with the statutory text.  Section 1512(c)(2) appears in a code provision entitled "Tampering with a witness, victim, or an informant."  18 U.S.C. § 1512.  It reads in full as follows:

> (c)   Whoever corruptly—
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

>    (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

The Supreme Court has described section 1512(c)(1) as "a broad ban on evidence-spoliation." *Yates*, 574 U.S. at 541 n.4 (quoting *id.* at 560 n.2 (Kagan, J., dissenting)).  Section 1512(c)(2), by contrast, operates as a "catch-all to cover 'otherwise' obstructive behavior that might not fall within the definition of document destruction." *Burge*, 711 F.3d at 809 (7th Cir. 2013).

The *actus reus* elements of section 1512(c)(2)—that is, the conduct elements of the crime—are admittedly broad.  *See Marinello*, 138 S. Ct. at 1106 ("The statutory words 'obstruct or impede' are broad.").  "Obstruct" and "impede" "can refer to anything that 'block[s],' 'make[s] difficult,' or 'hinder[s].'"  *Id.* (first quoting *Obstruct*, BLACK'S LAW DICTIONARY 1246 (10th ed. 2014); and then quoting *Impede*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 1248 (2d ed. 1954)).  "Influences" means "to affect or alter by indirect or intangible means."  *Influence*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/influence (last visited Dec. 16, 2021).  The word "otherwise" precedes these verbs and, in its adverbial form, means "in a different way or manner."  *Otherwise*, MERRIAM-WEBSTER'S DICTIONARY https://www.merriam-webster.com/dictionary/otherwise (last visited Dec. 16, 2021); *see also Otherwise*, Dictionary.com, https://www.dictionary.com/browse/otherwise (last visited Dec. 16, 2021) ("in another manner; differently"); *Otherwise*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/133247 (last visited Dec. 16, 2021) ("another way").  Taken together then, "Section 1512(c)(2) gives defendants fair warning in plain language that a crime will occur in a different ('otherwise') manner compared to § 1512(c)(1) if the defendant 'obstructs, influences, or impedes any official proceeding' *without regard to* whether the action relates to

documents or records." *United States v. Petruk*, 781 F.3d 438, 446–47 (8th Cir. 2015) (emphasis added).[6]

Under this straightforward reading, Defendants' indicted conduct readily falls within section 1512(c)(2)'s "expansive language." Defendants are accused of having, individually and collectively, acted with the purpose "to stop, delay, and hinder the Certification of the Electoral College vote." Indictment ¶ 38. Wearing paramilitary gear, and with some moving in a "stack" formation, *id.* ¶ 39h–i, Defendants "forcibly storm[ed]" past exterior barricades and law enforcement, *id.* ¶ 39j, to carry out a planned "operation to interfere with the Certification of the Electoral College vote," *id.* ¶ 39a. Once inside the Capitol building, some made their way to the Senate wing of the Capitol and "push[ed] against a line of riot police officers guarding the hallway connecting the Rotunda to the Senate," retreating only after officers deployed a chemical spray. *Id.* ¶¶ 151–154. Others moved toward the House of Representatives. *Id.* ¶ 156. Some entered with bear spray and assaulted police officers. *Id.* ¶¶ 164–168. Their alleged conduct was no mere political protest or trespass. *See* Crowl MTD at 4; Crowl Supp. Br. at 10. If proven, their conduct crossed the line to criminal conduct: they "corruptly" conspired to, and did, "obstruct, influence, and impede an official proceeding." *Id.* ¶¶ 37, 180.

Defendants make no effort to challenge this straightforward application of section 1512(c)(2). They instead assert that a narrower interpretation—that section 1512(c)(2) reaches only conduct that seeks to affect the integrity or availability of evidence in an official proceeding—

---

[6] The parties dispute whether the structure of section 1512(c)—consisting of two subsections separated by a semi-colon—means that subsection (c)(2) is "independent" of subsection (c)(1). *See* Gov't's Suppl. Br. at 5 (citing *United States v. Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009) (observing that section 1512(c)(2) is "plainly separate and independent of" section 1512(c)(1)); Crowl Supp. Br. at 8 (describing section 1512(c)(2) as a "dependent clause"). Neither party gets much mileage out of this debate. The more important point is that the subsections are separated by the word "otherwise," which connects the two provisions but underscores that the acts prohibited by (c)(1) are "different" from those prohibited by (c)(2).

is mandated based on contextual clues and due process concerns.  Their contention is not without

jurisprudential grounding.  The Supreme Court has cautioned that

> [w]hether a statutory term is unambiguous . . . does not turn solely
> on dictionary definitions of its component words.  Rather, the
> plainness or ambiguity of statutory language is determined not only
> by reference to the language itself, but as well by the specific context
> in which that language is used, and the broader context of the statute
> as a whole.

*Yates*, 574 U.S. at 537 (internal quotation marks and alterations omitted).  Further, the Court has

> traditionally exercised restraint in assessing the reach of a federal
> criminal statute, both out of deference to the prerogatives of
> Congress and out of concern that a "fair warning should be given to
> the world in language that the common world will understand, of
> what the law intends to do if a certain line is passed."

*Aguilar*, 515 U.S. at 600 (citations omitted) (quoting *McBoyle v. United States*, 283 U.S. 25, 27

(1931)).

Such restraint is particularly apt where, as here, the statute's proscriptions are, by

themselves, "innocuous."  *Arthur Andersen*, 544 U.S. at 703.  The terms "obstruct," "impede," and

especially "influence," unless meaningfully limited, sweep in wholly innocent and protected First

Amendment conduct.  *See id.* at 703–04 (observing that section 1512(b)(2)'s prohibition against

"corruptly persuad[ing] another to "withhold" documents or testimony "is not inherently malign");

*Poindexter*, 951 F.2d at 377–78 (stating that section 1505's bar on "influenc[ing]" must be limited

for it would otherwise produce "an absurd result that the Congress could not have intended in

enacting the statute").  For instance, a person outside the Capitol building protesting legislation

while it is under consideration by a congressional committee is surely attempting to "influence"

the proceeding, but no one would seriously contend that such an act violates section 1512(c)(2).

The same is true of a citizen who emails her congresswoman to urge her to vote against a judicial

nominee.  The court therefore appreciates the dangers that an unrestrained reading of section 1512(c)(2) would cause.

With these principles in mind, the court turns to Defendants' arguments.  Defendants press their preferred interpretation of section 1512(c)(2) primarily through the lens of two Supreme Court decisions:  *Begay v. United States* and *Yates v. United States*.  Crowl Suppl. Br. at 7 (arguing that "*Begay* is dispositive here"); *id.* at 17 (asserting that *Yates* "bars the government's interpretation of § 1512(c)(2)"); Connie Meggs Suppl. Br. at 2 (arguing that *Yates* "favors dismissal").  In both cases, the Court read the obstruction statutes at issue more narrowly than urged by the government to exclude the prosecuted acts.  But, as discussed below, both *Begay* and *Yates* differ from this case in important ways and do not compel the reading of section 1512(c)(2) that Defendants advocate.  The two cases also offer a useful framework for rejecting Defendants' various construction arguments.  The court ends this section by responding to Defendant Beeks's plea to apply principles of constitutional avoidance to limit section 1512(c)(2) to "'core' conduct— acts that affect the integrity and availability of evidence used in an official proceeding."  Beeks Suppl. Br. at 1.

*1.*     Begay v. United States

*Begay* involved the interpretation of the Armed Career Criminal Act.  The Act defined a "violent felony" in pertinent part as a crime that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that present[ed] a serious potential risk of physical injury to another."  18 U.S.C. § 924(e)(2)(B).  The question before the Court was whether a DUI qualified as a "violent felony," i.e., whether it "otherwise involve[d] conduct that presents a serious potential risk of physical injury to another."  *Begay*, 553 U.S. at 140.  The Court held that it did not.  The Court reasoned that "the provision's listed examples—burglary, arson, extortion, or

crimes involving the uses of explosives—illustrate the kinds of crimes that fall within the statute's scope." *Id.* at 142. The examples "limit[ed] the crimes that clause (ii) covers to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id.* at 143. The Court rejected the government's view that the word "otherwise" as it appears in the statute ("otherwise involves conduct that presents a serious potential risk of physical injury to another") "is *sufficient* to demonstrate that the examples do not limit the scope of the clause." *Id.* at 144. The Court reasoned:

> That is because the words "otherwise" *can* (we do not say *must*) refer to a crime that is similar to the listed examples in some respects but different in others—similar, say, in respect to the degree of risk it produces, but different in respect to the "way or manner" in which it produces that risk.

*Id.* (citations omitted) (citing dictionary definition of "otherwise" to mean "in a different way or manner").

Defendants take *Begay* to mean that the court here must read the word "otherwise" as creating a restriction. That is, in their view, section 1512(c)(2) extends only to those acts that are "similar" to the acts of evidence spoliation referenced in section 1512(c)(1). Crowl Suppl. Br. at 9. "Similar" acts, according to Defendants, include those that "affect the integrity or availability of evidence used in a proceeding," but not, as here, conduct intended to disrupt the proceeding itself without regard to any evidence presented. These contentions press *Begay* beyond its boundaries.

For one, *Begay* does not say, as Defendants seem to suggest, that anytime a statutory provision uses the term "otherwise" it serves a restrictive purpose. To the contrary, the Court said that "otherwise" "can" have that effect, not that it "must." 553 U.S. at 144. But more significantly, unlike the Armed Career Criminal Act, the term "otherwise" in section 1512(c)(2) does not follow

a list of examples.  That list was, the Court in *Begay* said, "a key feature of that text—namely, the four example crimes intended to illustrate what kind of 'violent felony' the statute covers."  *Id.* at 147.  That "key feature" is absent in section 1512(c).  Section 1512(c)(1) contains a general prohibition on record spoliation; it is not a list of example crimes from which some common feature can be gleaned.  True, the word "otherwise" connects sections 1512(c)(1) and (c)(2), but unlike in *Begay*, its presence does not mean that acts prohibited by section 1512(c)(2) must bear some degree of similarity to evidence spoliation.  "Otherwise" means "in a different way or manner."  And so, the natural reading of the two sections is that section 1512(c)(2) "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction."  *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (citation and internal quotation marks omitted).  *Begay* therefore does not compel Defendants' limited reading of section 1512(c)(2).

Defendants also colorfully assert that the government's interpretation of section 1512(c)(2) "out-*Begay*s *Begay*."  Crowl Suppl. Br. at 10.  That is so, according to Defendants, because the offenses charged in Counts One and Two are not only dissimilar to the evidence spoliation prohibited by section 1512(c)(1) but also dissimilar to "[e]very crime in §§ 1512(a)–(c)(1) and (d)," which are "designed to affect the integrity or availability of evidence in a proceeding."  Crowl Suppl. Br. at 10.  That characterization is simply not correct.  Subsections (a) and (b) are, concededly, largely aimed at proscribing conduct that affects the presentation of evidence at an official proceeding—but not entirely.  Each subsection also makes unlawful certain acts that cause another to "hinder, delay, or prevent the communication" of an offense to law enforcement and judicial officers.  18 U.S.C. § 1512(a)(2)(C), (b)(3).  What's more, subsection (d) has little to do with the presentation of evidence.  It does, in one of four subparagraphs, prohibit harassment of

31

another person to hinder, delay, prevent, or dissuade giving "testi[mony] in an official proceeding," *id.* § 1512(d)(1), but the same subparagraph makes unlawful harassment that affects mere "attending" of an official proceeding, *id.*, and the remaining subparagraphs concern the reporting of crimes or other violations to law enforcement and judicial officers, *id.* § 1512(d)(2)–(4).  Thus, section 1512 is not, as Defendants contend, targeted exclusively at protecting the presentation of evidence at an official proceeding.  It also extends to conduct that "hinders" or "delays" initiation or institution of legal process.  It is not a far leap from that object to the purpose of the conspiracy offense charged here: "to stop, delay, and hinder the Certification of the Electoral College vote." Indictment ¶ 38.  "Official proceedings are crucial to the conduct of government.  They are entitled to go forward free of corrupting influences that *not only delay them* but increase the chances of false and unjust outcomes."  *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (emphasis added).  The government's reading of section 1512(c)(2) therefore does not "out-*Begay Begay*."

> 2.   Yates v. United States

Next up is *Yates v. United States*.  *Yates* is the curious case in which the Supreme Court held that undersized fish are not "tangible object[s]" for purposes of a different obstruction statute, which makes it unlawful to "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record, document, or tangible object."  18 U.S.C. § 1519. In *Yates*, the government secured a conviction under section 1519 of a fisherman who knowingly disposed of undersized fish to impede a federal investigation into the size of his catch.  574 U.S. at 533–34.  The Supreme Court reversed the conviction, holding that for purposes of section 1519 the term "tangible object" "cover[s] only objects one can use to record or preserve information, not all objects in the physical world" and therefore excludes fish.  *Id.* at 536.  A plurality of the

justices relied on a host of tools of construction to reach that result.  The plurality looked at, in order, (1) the title of section 1519, (2) the section's "position" within Chapter 73 of Title 18, (3) the legislative history, (4) the canon against surplusage, (5) and two additional interpretive canons, *noscitur a sociis* (i.e., the meaning of an ambiguous term should be determined by considering the words with which it is associated in context) and *ejusdem generis* (i.e., when general words follow specific words, the general words are usually construed to embrace only objects similar in nature to the proceeding words).  *Id.* at 539–45.  These "traditional tools of statutory interpretation to examine markers of congressional intent," the plurality held, made it "highly improbable that Congress would have buried a general spoliation statute covering objects of any and every kind in a provision targeting fraud in recordkeeping." *Id.* at 546.

Justice Alito, who concurred, was more restrained in his analysis.  He relied on section 1519's "list of nouns, its list of verbs, and its title," in combination, to join in reversing the fisherman's conviction.  *Id.* at 549 (Alito, J., concurring).  Starting with the list of nouns and relying on the *noscitur a sociis* and *ejusdem generis* canons, Justice Alito said the term "tangible object" "should refer to something similar to records or documents." *Id.* at 550.  He also found the statute's verbs—particularly "makes a false entry in," "alters," and "falsifies"—"ma[de] no sense outside of" or were "closely associated with filekeeping." *Id.* at 551.  Finally, he found the statute's title  ("Destruction, alteration, or falsification of *records* in Federal investigations and bankruptcy") "especially valuable" because "it reinforces what the text's nouns and verbs independently suggest—that no matter how other statutes might be read, this particular one does not cover every noun in the universe with tangible form." *Id.* at 552.

The parties dispute whether the *Yates* plurality's or Justice Alito's reasoning controls, but the court need not decide between the two.  The interpretative tools used in *Yates*—which the court takes up in the sequence considered by the plurality—do not help Defendants' cause.

*The statute's title.*   The title of section 1512 ("Tampering with a witness, victim, or an informant") at first blush would seem to support Defendants, as all three of its objects are persons who supply testimony.  But that title predates the enactment of section 1512(c) by 20 years, *see* Victim and Witness Protection Act of 1982, Pub. L. 97-291, § 4(a), 96 Stat. 1248, 1249 (codified at 18 U.S.C. § 1512), so it sheds little light on the meaning of section 1512(c), which was adopted as part of the Sarbanes-Oxley Act of 2002.  In that legislation, what would be codified as section 1512(c) appeared under the header "Tampering with a Record or Otherwise Impeding an Official Proceeding."  Sarbanes-Oxley Act of 2002, Pub. L. 107-204, § 1102, 116 Stat. 745, 807 (codified at 18 U.S.C. § 1512(c)).  That header provides no support for Defendants' proffered narrow reading.  *See iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 65 (D.C. Cir. 2021) (noting that, although section headings may be a "helpful resource to interpret an ambiguous statute," they "may not be used to create ambiguity" and "do not control an act's meaning by injecting a legislative intent or purpose not otherwise expressed in the law's body") (quoting 2A SUTHERLAND STATUTORY CONSTRUCTION § 47:14 (Norman J. Singer ed., 7th ed. 2007)).

*Section 1512(c)'s position within Chapter 73 of Title 18.*   In *Yates*, the plurality found that section 1519's placement at the end of Chapter 73 of Title 18 justified a narrowed reading because it was put alongside other "specialized provisions expressly aimed at corporate fraud and financial audits."  574 U.S. at 541.  The plurality contrasted this placement with other obstructive-act provisions of Sarbanes-Oxley, including what would become section 1512(c), which Congress put "within or alongside" existing provisions "relating broadly to official proceedings and criminal

trials." *Id.* at 540. Because section 1519 was not among these "broad proscriptions," the plurality explained, its placement "accords with the view that Congress' conception of § 1519's coverage was considerably more limited than the Government's." *Id.* at 541.

By this logic, no narrowing is justified here. Congress put section 1512(c) among the preexisting "broad proscriptions"—section 1512—within Chapter 73. Narrowing its reading, as Defendants propose, would be at odds with its placement.

*Legislative history.* All agree that the legislative history of section 1512(c) is murky, but the one insight that emerges from it weighs against the limited interpretation Defendants urge. Section 1512(c) was introduced "late in the legislative process" as Amendment No. 4188 by Senate Minority Leader Trent Lott "at the specific request of the President." *Yates*, 574 U.S. at 562 (Kagan, J., dissenting) (citing 148 Cong. Rec. 12,512 (2002) (statement of Sen. Lott)). Senator Lott acknowledged that his amendment "overlap[ped]" with others but he did not see "major problems." 148 Cong. Rec. 12,512 (2002) (statement of Sen. Lott). Senator Orrin Hatch explained that the amendment "strengthens an existing federal offense that is often used to prosecute document shredding *and other forms of obstruction of justice*." *Id.* at 12,517 (statement of Sen. Hatch) (emphasis added). He explained that the then-existing section 1512[7] "currently prohibits individuals from persuading others to engage in obstruction conduct. However, it does not prohibit an act of destruction committed by a defendant acting alone. . . . This amendment closes this loophole by *broadening the scope* of the Section 1512." *Id.* (emphasis added).[8] The Senate Judiciary Committee's Report alluded to this shortcoming in the existing section 1512, albeit

---

[7] The Congressional Record reads "Section 1520 of Title 18," 148 Cong. Rec. 12,517 (2002) (statement of Sen. Hatch), but this is clearly a typographical error, as there was not then a "Section 1520 of Title 18." That section was added by Sarbanes-Oxley.

[8] Senator Hatch's comments also referred to another "loophole" in then-existing section 1512, which was that courts had interpreted the section as requiring a pending proceeding, but the amendment would cure that problem. With the amendment, section 1512 would reach cases in which "evidence is destroyed prior to the issuance of a grand jury subpoena." 148 Cong. Rec. 12,517 (2002) (statement of Sen. Hatch).

without explicitly referencing the text that would become 1512(c).  *See* S. REP. No. 107-146, at 6–7, 14, 15 (2002).

The one clear takeaway from this limited legislative history is that Congress intended for section 1512(c) to reach individuals who committed obstructive acts themselves, and not only those who directed their acts toward another.  *See id.* at 15 ("Finally, this section could also be used to prosecute a person who actually destroys the records himself in addition to one who persuades another to do so, ending yet another technical distinction which burdens successful prosecution of wrongdoers.").  To be fair, this legislative history says nothing about whether Congress meant for section 1512(c)(2)'s catch-all to reach beyond acts affecting evidence.  But Congress's undisputable intention to broaden existing law surely does not justify a narrowed construction.

*The canon against surplusage.*  In *Yates*, the plurality cabined its reading of "tangible object" in section 1519 because, if read broadly, it would "significantly overlap" with section 1512(c)(1).  574 U.S. at 543.  The plurality questioned what "independent function § 1512(c)(1) would serve if the Government is right about the sweeping scope of § 1519" and refused a reading of "§ 1519 that would render superfluous an entire provision passed in proximity as part of the same Act."  *Id.*

Defendants latch onto this surplusage rationale and rely on it heavily.  Crowl Suppl. Br. at 5, 14–17; Ulrich Suppl. Br. at 8.  They contend that, under the government's reading of section 1512(c)(2), "the words 'or otherwise' have no meaning."  Crowl Suppl. Br. at 5.  They also insist that the government's construction renders the rest of section 1512 and "swathes" of Chapter 73 surplusage.  *Id.* at 14–16.  The court rejects Defendants' surplusage contentions for multiple reasons.

First, the surplusage concern animating the *Yates* plurality was rendering superfluous "an entire provision passed in proximity as part of the *same Act*." 574 U.S. at 543 (emphasis added). Here, the only provision passed as part of Sarbanes-Oxley that Defendants contend would be rendered superfluous by the government's construction is section 1519, *see* Crowl Suppl. Br. at 17, but the Court in *Yates* expressed no concern about what the breadth of section 1512(c)(2) meant for section 1519. And, as discussed above, Congress well understood that the late addition of section 1512(c) at the behest of the President would overlap with the Act's other provisions. "Some overlap in criminal provisions is, of course, inevitable," *Marinello*, 138 S. Ct. at 1107, and Congress seems to have not only understood that here but intended it.

Second, the government's reading does not render the term "otherwise" surplusage. "Otherwise," as discussed, means "in a different way or manner." Consistent with its plain meaning, "otherwise" thus expands the obstructive acts that are unlawful beyond the acts of evidence spoliation made unlawful by section 1512(c)(1). Reading 1512(c)(2) to include the obstructive acts charged here does not render "otherwise" surplusage.

Third, Defendants never really explain how their construction resolves the purported surplusage problem. In fact, it doesn't. Construing section 1512(c)(2) to reach acts affecting only the integrity or availability of evidence still creates overlap with other subsections of 1512. Those subsections largely concern "testimony," "record[s]," "document[s]," and "object[s]" to be presented at an official proceeding. 18 U.S.C. § 1512(a)–(b). Therefore, interpreting section 1512(c)(2) to reach acts only affecting evidence serves no meaningful narrowing function to avoid or minimize the overlap that Congress created by the broad terms it placed in section 1512(c)(2).

Fourth, Defendants' criticism that a broad construction of 1512(c)(2) will render the rest of section 1512 surplusage is overstated. Section 1512(a) will undoubtedly continue to have

vitality, where applicable, because of the stiffer sentences it imposes (up to life in cases of murder and up to 30 years in other cases).  18 U.S.C. § 1512(a)(3).  Likewise, reading section 1512(c)(2) consistent with its legislative purpose also would not create surplusage with section 1512(b), which prohibits intimidation, threats, and corrupt persuasion of "another person."  Interpreting section 1512(c)(2), as alleged here, to reach obstructive acts whose object is *not* "another person" but the official proceeding itself creates no conflict with 1512(b).  Finally, if there is a concern about the breadth of section 1512(c)(2) it would be with respect to its impact on section 1512(d), which imposes only a three-year maximum penalty.  The "harass[ment]" prohibited by section 1512(d) arguably could be swept up by section 1512(c)(2)'s broad proscription, transforming three-year felonies into 20-year felonies, thereby vesting substantial leverage in charging and plea bargaining to prosecutors.  But section 1512(d) is different two critical respects.  One, it requires only that the person act "intentionally," and not "corruptly."  That more stringent *mens rea* element serves as an important barrier to charging mere harassment as a 20-year felony.  And, two, as discussed, subsections 1512(d)(2) through (d)(4) extend to acts not impacting official proceedings.  So, even a broad understanding of section 1512(c)(2) will not render 1512(d) obsolete.

Finally, Defendants do not explain how their favored reading of section 1512(c)(2) avoids the substantial overlap that already exists between section 1512(c)(2) and some other provisions of Chapter 73 of Title 18.  Section 1503, for instance, includes an "Omnibus Clause" that "serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice," which the Court has interpreted to mean an action taken "with an intent to influence judicial or grand jury proceedings."  *Aguilar v. United States*, 515 U.S. 593, 598, 599 (1995).  Section 1505 makes it unlawful to "corruptly . . . influence[], obstruct[], or impede[]," or endeavor to do so, "the due and proper administration of" justice "under which any pending

proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by" Congress or any subdivision thereof.  18 U.S.C. § 1505.  The broad conduct prohibited by these provisions overlaps substantially, if not entirely, with section 1512(c)(2) ("corruptly . . . influenc[ing], obstruct[ing], or imped[ing]"), and the definition of "official proceeding" applicable to section 1512(c)(2) encompasses many (though not all)[9] of the proceedings or processes to which sections 1503 and 1505 are addressed.  *See* 18 U.S.C. § 1515(a)(1)(A) (defining "official proceeding" to broadly include judicial and grand jury proceedings); *id.* § 1515(a)(1)(C) (defining "official proceeding" to mean "a proceeding before a Federal Government agency which is authorized by law").  As noted, overlap "is not uncommon in criminal statutes," *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014), and construing section 1512(c)(2) to reach only acts affecting the availability or integrity of evidence does nothing to cure or diminish that overlap here.

Defendants also cite to sections 1510 and 1513, Caldwell Suppl. Br. at 17, but reading section 1512(c)(2) broadly poses no threat to them.  Section 1510, in part, addresses obstruction of criminal investigations, 18 U.S.C. § 1510(c), which courts uniformly have held do not qualify as "official proceedings," *see, e.g.*, *United States v. Ermoian*, 752 F.3d 1165, 1172 (9th Cir. 2013)*; United States v. Ramos*, 537 F.3d 439, 463 (5th Cir. 2008), and therefore creates no superfluity problem.  Section 1513 prohibits acts of retaliation against witnesses.  18 U.S.C. § 1513.  By their very nature, retaliatory acts, which are done in reaction to, for example, testimony already given, are less likely to affect future official proceedings, which is the focus of section 1512(c)(2).  Defendants' surplusage contentions are thus not borne out by the statutes themselves.

---

[9] An "investigation . . . had by either House," 18 U.S.C. § 1505, will not always qualify as a "proceeding before Congress," *id.* § 1515(a)(1)(B), as congressional investigations often are undertaken by staff and are not on the public record.

*Noscitur a sociis and* ejusdem generis *interpretative canons.*   Finally, the *noscitur a sociis* and *ejusdem generis* interpretative canons, on which the plurality and concurring opinions in *Yates* relied, do not apply to section 1512(c).  Both of those canons come into play only to resolve ambiguity, not to create it.  *See Russell Motor Car Co. v. United States*, 261 U.S. 514, 520 (1923) ("'Noscitur a sociis' is a well-established and useful rule of construction, where words are of obscure or doubtful meaning, and then, but only then, its aid may be sought to remove the obscurity or doubt by reference to the associated words."); *United States v. Espy*, 145 F.3d 1369, 1371 (D.C. Cir. 1998) ("*Ejusdem generis* only comes into play when the general term in the list is so broad that it creates ambiguity.").  There is no such ambiguity here.

Moreover, "both the *ejusdem* and the *noscitur* canon apply when the term in question is directly preceded by a list of terms."  *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021).  Section 1512(c) is not a list of terms; nor does it contain a general word or phrase that follows a list of specifics.[10]  Section 1512(c)(1) describes one way to obstruct, influence, or impede an official proceeding:  through evidence spoliation.  The fact that section 1512(c)(1) uses multiple verbs (alter, destroy, mutilate, and conceal) and multiple nouns ("record, document, or other object") to describe the prohibition against evidence spoliation does not make it the type of list from which the court can infer that Congress meant to constrain the meaning of the catch-all provision that immediately follows.  *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) ("The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase.");

---

[10] For this reason, *Trans Union Corp. v. FTC*, 81 F.3d 228 (D.C. Cir. 1996), is inapposite.  *See* Def. Crowl Reply to Gov't Omnibus Opp'n to His Mot. to Dismiss the § 1512(c)(2) Counts, ECF No. 400, at 26–27.  That case involved 15 U.S.C. § 1681b(3)(E), which contains a true list of terms contained in multiple, separate sub-paragraphs followed by a catch-all provision in a different sub-paragraph that starts with the term "otherwise."  The court held that application of *ejusdem generis* was appropriate in that context.  Section 1512(c)(2) contains no similar list of terms.

*iTech U.S.,* 5 F.4th at 65 (rejecting application of *noscitur* and *ejusdem* canons to 8 U.S.C. § 1252(a)(2)(B), which, like section 1512(c)(2), is structured as two disjunctive sub-paragraphs and separated by a similarly broad term "any other").  Nor have Defendants identified a single case that has treated it that way.

*      *      *

In summary, none of the tools of construction that Defendants invoke from *Yates* justify the narrow construction of section 1512(c)(2) that they favor.  A plain reading of the text reaches the charged conduct.

> 3.     *Constitutional avoidance principles do not necessitate limiting section 1512(c)(2) to acts affecting the integrity and availability of evidence*

Defendant Beeks invokes two additional canons of statutory interpretation that are sometimes referred to as "constitutional avoidance":  the presumption of constitutionality and the constitutional-doubt canon.  Beeks Suppl. Br. at 1.  The former "holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional," *United States v. Davis*, 588 U.S. __, __, 139 S. Ct. 2319, 2332  n.6 (2019), and the latter "militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality," ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 247–48 (2012).  To "sidestep constitutional quicksand," Defendants Beeks contends, these principles compel a construction of section 1512(c)(2) that reaches "only its core conduct—acts that affect the integrity and availability of evidence used in an official proceeding."  Beeks Suppl. Br. at 1.  He cites three cases in which the Supreme Court applied principles of constitutional avoidance to narrow an ambiguous statute—*Skilling v. United States*, *McDonnell v. United States*,

41

and *Marinello v. United States*—and urges the court to do the same here. *Id.* at 2. The court declines the invitation.

Constitutional avoidance principles permit a court to avoid a constitutional question "only where the saving construction is not plainly contrary to the intent of Congress." *Miller v. French*, 530 U.S. 327, 341 (2000) (internal quotation marks omitted). A court cannot "cannot press statutory construction to the point of disingenuous evasion even to avoid a constitutional question." *Id.* (internal quotation marks omitted). And the constitutional-doubt canon "does not apply if the statute at issue is unambiguous." *M.M.V. v. Garland*, 1 F.4th 1100, 1107 (D.C. Cir. 2021). Here, the *actus reus* elements of section 1512(c)(2) ("obstructs, influences, or impedes") are not ambiguous. They are broad, to be sure, but not ambiguous. Their plain meaning gave these Defendants fair notice that their alleged conduct—planning and organizing and joining thousands to disrupt an official proceeding before Congress—was prohibited under section 1512(c)(2). Constitutional avoidance principles, therefore, have no application here.

The cases on which Beeks relies do not compel a different result. In *Skilling v. United States*, the Court narrowly read 18 U.S.C. § 1346 as limited to "core" cases of bribery and kickback schemes to avoid constitutional uncertainty in "honest-services" fraud prosecutions. 561 U.S. 358, 407–08 (2010). Section 1346 defines a "scheme or artifice to defraud" for purposes of anti-fraud laws to include "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Skilling had asked the Court to strike down section 1346 as "impermissibly vague," but the Court preserved it by limiting its construction. *Skilling*, 561 U.S. at 405. *Skilling* differs from this case in three critical ways. First, Skilling had urged "invalidation" of section 1346, *id.* at 403, whereas Defendants here do not genuinely press that contention. The court thus is not confronted with having to narrow section 1512(c)(2) to save it entirely. Second, in *Skilling*

42

there was no genuine dispute as to the ambiguity of the term "intangible right to honest services." Even the government did not contend otherwise.  Section 1512(c)(2), by contrast, is amenable to a "plain language" reading that covers the charged offenses.  *Petruk*, 781 F.3d at 446.  Finally, the narrowing performed in *Skilling* took place against a robust history of jurisprudential and congressional activity regarding the honest-services doctrine that allowed the Court to limit section 1346 to "core" acts of bribery and kickbacks.  *See Skilling*, 561 U.S. at 404–05 (explaining that Congress enacted section 1346 in response to *United States v. McNally*, 483 U.S. 350 (1987), which struck down the honest-services doctrine, and "meant to reinstate the body of pre-*McNally* honest-services law," whose "core" included bribery and kickback prosecutions (internal quotation marks omitted)).  No similar history presents itself here.  The court, therefore, would be creating a narrowed construction from whole cloth, which it will not do.

*McDonnell v. United States* does not demand a more restrictive reading, either.  There, the Court rejected the government's reading of the term "official act" in 18 U.S.C. § 201 as reaching "nearly any activity by a public official."  579 U.S. __, __, 136 S. Ct. 2355, 2368 (2016).  The government had urged that the term "official act" include "workaday functions," such as "setting up a meeting, calling another public official, or hosting an event."  *Id.* at 2368.  The Court read "official act" as encompassing only a "formal exercise of governmental power" that is "specific and focused" on a pending matter or one that may be brought before a public official.  *Id.* at 2372. This narrowed reading avoided a "vagueness shoal."  *Id.* at 2373 (quoting *Skilling*, 561 U.S. at 368).  The vagueness concerns that animated *McDonnell* are not present here.  For one, the Court expressed worry that the government's essentially unbounded definition of "official act" would chill the conduct of public officials who, as a matter of course, made meeting arrangements and contacted other officials for constituents.  *Id.* at 2372.  If such constituents made campaign

contributions or extended invitations to the public official, as often happens, "[o]fficials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.* Such concerns are less pronounced here. Their alleged actions were no mere political protest. They stand accused of combining, among themselves and with others, to force their way into the Capitol building, past security barricades and law enforcement, to "stop, delay, and hinder the Certification of the Electoral College vote." Indictment ¶ 38. Prosecuting such conduct under section 1512(c)(2) poses little risk of chilling otherwise protected activities. The Court in *McDonnell* also was concerned that the "standardless sweep" of the government's proposed definition could subject public officials, without fair notice, to prosecution/potential criminal liability "for the most prosaic interactions." 136 S. Ct. at 2373 (internal quotation marks omitted). A straightforward reading of section 1512(c)(2), by contrast, would have provided these Defendants with sufficient notice that their alleged acts, even though not affecting evidence, put them in danger of prosecution. Even if there were a line of ambiguity inherent in section 1512(c)(2), their alleged acts went well beyond it.

Finally, *Marinello* does not aid Defendants' cause. There, the Court grappled with the catchall clause of 26 U.S.C. § 7212, which makes it unlawful to "corruptly . . . obstruct[] or impede[] . . . the due administration of" the Internal Revenue Code. 26 U.S.C. § 7212(a). The Court observed that the word "administration" could refer to every task of the Internal Revenue Service but was better read as referring to "specific, targeted acts of administration." 138 S. Ct. at 1106. To hold otherwise, the Court said, would make section 7212 a catchall "for every violation that interferes with what the Government describes as the 'continuous, ubiquitous, and universally known' administration of the Internal Revenue Code." *Id.* at 1107. That worry is not present here.

44

The "object" of section 1512(c)(2) is an "official proceeding," a term that is not nearly as expansive as the "due administration" of the Internal Revenue Code. *See id.* at 1106 (observing that "the verbs 'obstruct' and 'impede' suggest an object—the taxpayer must hinder a particular person or thing"). Unlike "due administration," Congress gave "official proceeding" a statutory definition, *see* 18 U.S.C. § 1515(a)(1), whose plain terms encompass the Certification of the Electoral College vote. What Defendants propose is to cut back section 1512(c)(2)'s object from an "official proceeding" to "evidence used in an official proceeding." Beeks Suppl. Br. at 1. But that is not what the statute says, and there is no call for such judicial pruning.

Moreover, the guardrails that the Court fashioned in *Marinello* apply to section 1512(c)(2). The Court held that, to prove a violation of section 7212, "the Government must show (among other things) that there is a 'nexus' between the defendant's conduct and a particular administrative proceeding, such as an investigation, an audit, or other targeted administrative action." 138 S. Ct. at 1109. "That nexus requires a 'relationship in time, causation, or logic with the [administrative] proceeding.'" *Id.* (quoting *Aguilar*, 515 U.S. at 599). Here, the government concedes that section 1512(c)(2) is similarly limited. It requires proof of "nexus": that is, the defendant "contemplated a particular, foreseeable proceeding, and that the contemplated proceeding constituted an official proceeding." Gov't's Suppl. Br. at 16 (quoting *United States v. Young*, 916 F.3d 368, 386 (4th Cir. 2019)). And it reaches only particular types of congressional business: a "proceeding" "before" Congress. Courts have construed such terms as implying some degree of formality and convening, *see Ermoian*, 752 F.3d at 1170–72; *Ramos*, 537 F.3d at 462–63, meaning that certain types of congressional business, like issuing subpoenas for records and testimony or conducting voluntary interviews, are beyond the statute's purview. Section 1512(c)(2) is admittedly broad.

But it is not so capacious that the court must adopt Defendants' preferred reading to avoid a "vagueness shoal."

### D.     Neither the Rule of Lenity nor the Novel Construction Principle Appies Here

Defendants resort to two additional tools of statutory construction to backstop their reading of section 1512(c)(2):  the rule of lenity and the novel-construction principle.  Harrelson MTD at 20–23; Crowl Suppl. Br. at 23–24.  Neither applies here.

The rule of lenity provides that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."  *Cleveland v. United States*, 531 U.S. 12, 25 (2000).  That rule, however, "applies only when, after consulting traditional canons of statutory construction, [a court is] left with an ambiguous statute."  *United States v. Shabani*, 513 U.S. 10, 17 (1994).  Stated differently, a court may resort to the rule of lenity only if "after seizing everything from which aid can be derived" there still remains "grievous ambiguity or uncertainty."  *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998).  "The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree."  *Id.* at 138.

Here, after applying the traditional rules of construction, the court is not left with "grievous ambiguity or uncertainty" about the meaning of section 1512(c)(2).  As discussed, "[s]ection 1512(c)(2) gives defendants fair warning in plain language that a crime will occur in a different ('otherwise') manner compared to § 1512(c)(1) if the defendant 'obstructs, influences, or impedes any official proceeding' without regard to whether the action relates to documents or records."  *United States v. Petruk*, 781 F.3d 438, 446–47 (8th Cir. 2015).  Lenity has no place when a statute "gives defendants fair warning in plain language."

The court also need not resort to the novel-construction principle.  That principle has its roots in *Bouie v. City of Columbia*, in which the Court said that an "unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I., § 10, of the Constitution forbids."  378 U.S. 347, 353 (1964).  That principle applies only where the judicial "construction unexpectedly broadens a statute which on its face had been definite and precise."  *See id.*  That is not the case here.  To be fair, as Defendants point out, Crowl Suppl. Br. at 6, previous opinions addressing the scope of section 1512(c)(2) have involved conduct that impairs or interferes with the presentation of some form of evidence in an official proceeding, whether it be securing false testimony, *e.g.*, *Petruk*, 781 F.3d at 446–47 (securing false alibi witnesses); *United States v. Volpendesto*, 746 F.3d 273, 286–87 (7th Cir. 2014) (impeding grand jury investigation), creating false evidence (e.g., *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (false interrogatory responses), or destroying evidence, *e.g.*, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (burning apartment to conceal bodies of two murder victims).  But none of those courts have said that section 1512(c)(2) extends no further than the impairment of or interference with evidence presentation.  And, the government is not required to point to a prior "fundamentally similar" prosecution to provide fair warning.  *See United States v. Lanier*, 520 U.S. 259, 270–71 (1997).  The statutory text is plain, and that is enough to satisfy due process.

### E.   Defendants' Prosecution Under Section 1512(c)(2) Does Not Violate the First Amendment

Finally, Defendants maintain that Counts One and Two run afoul of the First Amendment. Harrelson MTD at 24–25; Connie Meggs Suppl. Br. at 7.  Their argument seems to be that section 1512(c)(2) is unconstitutional as to them—another as-applied challenge—because their conduct was protected First Amendment expression.  Harrelson MTD at 24 (asserting that "there is no

47

argument that the conduct charged under § 1512(c)(2) was not protected expression"). Again, the court disagrees.

The Second Circuit rejected a similar argument in *United States v. Thompson*, 76 F.3d 442 (2d. Cir. 1996). There, the defendant was convicted of witness tampering in violation of 1512(b)(1), and on appeal argued that "§ 1512 violated his First Amendment rights by broadly 'proscrib[ing] persuasion.'" *Id.* at 452. The court rejected that argument, reasoning that "[a] prohibition against corrupt acts is clearly limited to . . . constitutionally unprotected and purportedly illicit activity." *Id.* at 452 (internal quotation marks omitted). "By targeting only such persuasion as is 'corrupt[],' § 1512(b) does not proscribe lawful or constitutionally protected speech and is not overbroad." *Id.*; *accord United States v. Shotts*, 145 F. 3d 1289, 1300 (11th Cir. 1998) (citing *Thompson*); *United States v. Brenson*, 104 F.3d 1267, 1280 n.6 (11th Cir. 1997) ("A prohibition against corrupt acts does not proscribe constitutionally protected speech and is clearly limited to unprotected activity.").

The same is true here. Section 1512(c)(2) targets only "corrupt" acts of obstructing, influencing, or impeding an official proceeding. Therefore, it does not "proscribe lawful or constitutionally protected speech." *Thompson*, 76 F.3d at 452. And the indictment here reflects that the government is not prosecuting protected speech. Rather, it charges Defendants with conspiring "to stop, delay, and hinder the Certification of the Electoral College vote." Indictment ¶ 38. They allegedly carried out the conspiracy by various means, including "[a]greeing to participate in and planning an operation to interfere with the Certification of the Electoral College vote on January 6, 2021," i.e. "the January 6, operation," *id.* ¶ 39a; bringing and contributing paramilitary gear and supplies—including firearms—for the January 6 operation, *id.* ¶ 39f; forcibly storming past exterior barricades, Capitol Police, and other law enforcement officers to

enter the Capitol building, *id.* ¶ 39j; and using encrypted communications during the January 6 operation, *id.* ¶ 39k.  If the government can carry its burden of proof at trial, a conviction of Defendants premised on such activities would not violate the First Amendment.

## V.      CONCLUSION AND ORDER

For the foregoing reasons, Defendants' motions to dismiss Counts One and Two of the indictment are denied.

Dated:  December 20, 2021

Amit P. Mehta
United States District Court Judge