UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | Case No. 21-cr-28-APM |
| **JASON DOLAN,** | |
| Defendant. | |

**GOVERNMENT'S SENTENCING MEMORANDUM, AND
MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Defendant Jason Dolan is set to be sentenced on charges of conspiracy and obstruction for his role in plotting with members and affiliates of the Oath Keepers to forcibly oppose the certification of the 2020 presidential election and then participating in the attack on the Capitol on January 6, 2021. Dolan pled guilty to these offenses in September 2021, pursuant to a cooperation plea agreement. He has fulfilled every requirement of that agreement, including by testifying against his co-conspirators in the grand jury and at trial.

For the reasons set forth herein, the government requests that this Court sentence Dolan to three years of supervised probation, with the special conditions that he perform 120 hours of community service and pay $2,000 in restitution and the mandatory $200 special assessment. Such a sentence would be sufficient to reflect the seriousness of this offense while also accounting for Dolan's fulsome acceptance of responsibility and substantial assistance to law enforcement.

I.   **FACTUAL BACKGROUND**

In the aftermath of the election, Dolan joined the Oath Keepers because he was "angry"

1

about the election results. *United States v. Elmer Stewart Rhodes III, et al.*, No. 22-cr-15-APM, 10/18/22AM Tr. at 4074.[1] As a member of the Florida chapter of Oath Keepers, Dolan participated in the group's encrypted chats about the need to use any means necessary, up to and including the use of force, to stop what they saw as the theft of the election. For example, on December 6, 2020, Dolan, a military veteran, messaged the group:

> I'm waiting on all legal remedies (from legitimate or illegitimate) courts to be solved. I have Christmas plans with family but come the new year (for me anyway) I have to be mentally prepared for however far I'm willing to go to stand for America, for the Constitution, for the President & for the survival of our ideals. . . . [T]his time there is no coming back, no pay, now awards, no homecomings, and if I'm lucky I get a prison sentence, tagged with treason, or a bullet from the very people I would protect. Yet I swore to defend this country against all enemies foreign & domestic. I think my biggest trouble is trying to convince myself to say good bye to my family, after all they had to endure, with the likelihood of never seeing them again...again.

Gov. Exh. 5308 (Msg. 1.S.656.6538).

In late December 2020, the group began to focus on January 6, 2021, and the proceeding before Congress to certify the election, as a date and occasion for action. On December 23, 2020, Kelly Meggs, the leader of the Florida Oath Keepers, told those on the chat: "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside! Scare the hell out of them with about a million surrounding them should do the trick!" Gov. Exh. 9514 (Msg. 1.S.656.9619). He then posted a photograph of Oath Keepers flags and wrote, "These will be flying Jan 6th in front of he Capitol!!" *Id.* (Msg. 1.S.656.9620). The next day, Meggs wrote to the same chat, "We have 10-12 staying there. So it's gonna be a WILD time in DC we gotta get the crowd

---

[1] Subsequent references herein to transcripts and trial exhibits are all from the *Rhodes* trial, unless otherwise stated.

going during the day. I think we get everyone up good and close to the Capitol bldg so they can here is inside. Then at night well whatever happens happens." *Id.* (Msg. 1.S.656.9990).

On December 25, 2020, Stewart Rhodes, the leader of the group, sent a message to the chat warning of the likelihood that Congress would "screw over" Trump on January 6, and told the group that "[t]he only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing." Gov. Exh. 9514 (Msg. 1.S.656.10096-97). Accordingly, Rhodes told the Florida Oath Keepers, they would show President Trump that they were willing to help him fight to stay in power, and "if he fails to act, then we will. He needs to understand that we will have no choice." *Id.* (Msg. 1.S.656.10102). Dolan testified about these messages and said he understood Rhodes to be saying that "If the President wasn't going to act, then we would have to act." 10/18/22PM Tr. at 4099.

These types of threats prompted Michael Adams, the leader of the Florida chapter of Oath Keepers prior to Meggs, to resign his position. Adams testified he stepped down because he took Rhodes' words as "telling the President of the United States . . . that if he didn't do this, we were." 12/16/22AM Tr. at 1618-19. Adams said he did not want to be part of that plan. *Id.* Others, including Dolan, did want to be part of Rhodes' plan to "scare the shit out of" Congress on January 6. As Dolan explained in his trial testimony, "We saw ourselves as patriotic Americans, willing to fight back against an illegitimate government and support what we saw as the rightful President against an illegitimate President," and "if need be, then to take up arms and fight back." 10/18/22PM Tr. at 4099. According to Dolan, "[I]t was a feeling like our country was slipping out of our fingers and we needed to defend our country. Conquer or die." *Id.*

3

And so, Dolan joined his co-conspirators from Florida in making arrangements to carry out this objective. They created new encrypted planning chats on Signal with titles like "DC OP: Jan 6 21" and "OK FL DC OP Jan 6." On these chats, they coordinated plans for lodging and transportation and had extensive conversations about what weapons and gear they would bring, among other details. Gov. Exhs. 9514, 9557. They also held a series of "DC planning" GoToMeetings in the week leading up to January 6. Gov. Exhs. 1525, 1526. Finally, they planned the logistics for the "quick reaction force" ("QRF") that would provide the firepower to support the operation inside D.C. 10/31/22PM Tr. at 5768-71. The co-conspirators' intent in making these plans was clear: as Dolan explained, "The overall goal why is if the Insurrection Act was declared, we would have a QRF, quick reaction force, ready to go get our firearms in order to stop the election from being certified within Congress." 10/18/22PM Tr. at 4109. And as Meggs told one Facebook acquaintance on January 3, "The natives are very restless. Tell your friend this isn't a Rally." Gov. Exh. 6868 (Msg. 2000.T.289).

Understanding these intentions and plans, Dolan joined this group in traveling to D.C. He contributed his own weapons to the QRF. And on January 6, 2021, he breached the Capitol with them, in an effort to stop the certification proceeding.

That afternoon, Dolan and another Florida Oath Keeper (Kenneth Harrelson) had gone ahead to the Capitol grounds. ECF No. 428 (Statement of Offense) at ¶13. Shortly after 2:00 p.m., a mob on the east side of the Capitol broke through the barricades, pushed back officers, and advanced up the central exterior staircase, to the landing outside the East Rotunda Doors. *Id.* at ¶15. Dolan and Harrelson were part of this crowd. *Id.* Dolan maneuvered his way to the front of the mob and made physical contact with one of the Capitol Police officers who had reassembled

4

in a line on the steps and were trying to keep the crowd at bay. *Id.*; see also Gov. Exh. 1500.1

Half an hour later, when the rest of their group arrived, Dolan and Harrelson joined them in marching in a "stack" formation, with each person keeping a hand on the shoulder of the person in front of them, up the stairs, through the crowd, and into the Capitol. ECF No. 428 (Statement of Offense) at ¶¶16-17.

Once inside, half of the group, including Dolan, followed Meggs in pushing into the House side of the Capitol in search of Speaker of the House Nancy Pelosi. Gov. Exhs. 1500.1, 1506, 9553 (Msgs. 7.T.570.9758, 9760-61); 01/05/23AM Tr. at 3119-29. They stopped in the area of the Small House Rotunda, just outside Speaker Pelosi's suite of offices. *Id.* Meanwhile, the other half of the group, led by co-conspirator Jessica Watkins, tried to force their way past riot police to the Senate Chamber. Gov. Exhs. 1500.1, 1505. The government introduced video of Watkins yelling, "Push! Push! Push!" and "Get in there!" and "They can't hold us!" as she and six other co-conspirators joined the mob attempting to push down the hallway towards the Senate Chamber. Gov. Exh. 1505. Only by deploying chemical spray were the officers finally able to repel the rioters and hold their line. Gov. Exhs. 1505. Watkins later described her conduct in that hallway: "We were in the thick of it. Stormed the Capitol. Forced our way into the Senate and House. Got tear gassed and muscled the cops back like Spartans." Gov. Exh. 6734 (Msg. 192.T.1521).

Dolan testified that his actions on January 6 were directly linked to the implicit agreement he had entered into with Rhodes and other Oath Keeper members and affiliates to stop the lawful transfer of presidential power by any means necessary, up to and including the use of force. Dolan told the jury that the mission, as articulated by Rhodes, had been to support President Trump, if he invoked the Insurrection Act, in "stopping the certification of the election of President Biden," and

5

"if he didn't do it, then we would need to step up and stop the certification of what I saw—I don't want to put words in his mouth—but what I saw as an illegitimate election. So the certification process would still have to be stopped." 10/18/22PM Tr. at 4110. While Rhodes never directly told the group to attack the Capitol on January 6, 2021, Dolan testified that it was clear to everyone in the group that when President Trump failed to stop the certification, and rioters breached the Capitol, joining the riot and trying to stop the certification was consistent with the mission and their "commander's intent." *Id.* at 4109 ("[I]t was that same idea of the—the texts over and over: We will do something. We will do something. We will do something. And now here we are in front of the Capitol doors, and they opened. And it was: Let's do something.").

In the weeks after January 6, 2021, Dolan deleted from his cell phone certain data, including photographs he had taken while inside the Capitol and encrypted communications with at least some of the co-conspirators. ECF No. 428 (Statement of Offense) at ¶21.

## II.    THE CHARGES AND PLEA AGREEMENT

On September 15, 2021, Dolan waived his right to trial and pled guilty to Conspiracy, in violation of 18 U.S.C. § 371, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2.

## III.    STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, on the conspiracy count, Dolan faces up to five years of imprisonment, and on count two, he faces up to 20 years of imprisonment. ECF 1100 at ¶9. Each charge also carries a term of supervised release of not more than three years, a fine of up to $250,000, restitution, and a mandatory special assessment of $100. *Id.*

6

## IV.    THE IMPACT OF *FISCHER*

Since Dolan's guilty plea, in *United States v. Fischer*, the Supreme Court held that to prove a violation of 18 U.S.C. § 1512(c)(2) "the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or as we earlier explained, other things used in the proceeding, or *attempted* to do so." 603 U.S. ----, 144 S. Ct. 2176 (June 28, 2024) (emphasis added). The facts admitted to by Dolan in his statement of offense during his guilty plea are sufficient to establish an attempted violation of Section 1512(c)(2).

In addition, Dolan made far more significant and detailed, under oath, admissions about his conduct during his testimony at the related trial of *United States v. Elmer Stewart Rhodes III, et al.*, 22-cr-15-APM. As described in greater detail above, Dolan admitted that his breach of the Capitol was directly linked to the agreement he had entered into with other members and affiliates of the Oath Keepers to stop the lawful transfer of presidential power by any means necessary, up to and including the use of force: that the mission, as articulated by Oath Keepers' leader Stewart Rhodes, had been to support President Trump, if he invoked the Insurrection Act, in "stopping the certification of the election of President Biden," and "if he didn't do it, then we would need to step up and stop the certification of what I saw . . . as an illegitimate election. So the certification process would still have to be stopped." *United States v. Rhodes*, No. 22-cr-15 (APM), 10/18/22PM Trial Tr. at 4110. Dolan has acknowledged that he and his co-conspirators stockpiled weapons just outside the city to support this mission of stopping the certification of the election: "[W]e would have a QRF, quick reaction force, ready to go get our firearms in order to stop the election from being certified within Congress." *Id.* at 4109.

7

In other words, Dolan admitted through his trial testimony that he and his co-conspirators targeted—and intended to target—all aspects of the proceeding, including impairing the availability or integrity of the records, documents, objects, and other things used in the proceeding. These facts are clearly sufficient to establish, at a minimum, an *attempt* to obstruct an official proceeding, even under the standard articulated in *Fischer*.

Out of an abundance of caution, the government would suggest that, at the start of the sentencing hearing, the Court incorporate on the record in this case these under-oath admissions—and the many other admissions—made by Dolan during his trial testimony in the related *Rhodes* case and articulate that the Court finds these facts sufficient to provide a factual basis for the guilty plea and to establish all the elements of the offense of obstruction of an official proceeding, as clarified by the Supreme Court in *Fischer*.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background). The Guidelines apply to a "heartland of typical cases." *Koon v. United States*, 518 U.S. 81, 94-95 (1996). A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up).

A.      **The Calculation of the Parties and the Presentence Report**

At the time of the plea agreement, the parties estimated Dolan's total offense level to be 26, resulting in a Guidelines range of 63 to 78 months' imprisonment. ECF No. 427 at 4. However, this estimate was based on the presumption of the applicability of two specific offense characteristics under U.S.S.G. § 2J1.2 having to do with the interference with the administration of justice. Since that time, the D.C. Circuit decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024), which held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id*. at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice," does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes.

Thus, the following Sentencing Guidelines sections apply:

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Base Offense Level | 14 |
| U.S.S.G. §2J1.2(b)(3)(C) | Extensive Scope, Planning, Preparation | +2 |
| U.S.S.G. §3C1.1 | Obstruction (destroying documents) | +2 |
| U.S.S.G. §3E1.1(a) | Acceptance of Responsibility | -3 |
| | Total | 15 |

It is worth noting that, in addition to the fact that this adjustment was not contemplated by the parties at the time of the plea agreement, the defendant does not meet the criteria at U.S.S.G.

9

§4C1.1, as he played a role in transporting firearms in furtherance of his offenses of conviction. U.S.S.G. §4C1.1(a)(7).

The two counts of conviction are grouped for guideline calculation purposes because they involve the same victim and one or more acts or transactions. U.S.S.G. §3D1.2(b).

At a level 15, the recommended sentencing range would be 18 to 24 months of incarceration.[2]

### B.   Downward Departure for Substantial Assistance

The government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure for the substantial assistance Dolan has provided to law enforcement. The government submits that a seven-level downward departure is appropriate given the level and nature of assistance Dolan has provided.

The Guidelines provide that, "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. In determining the appropriate level of reduction to apply, the Court should consider the following factors:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

---

[2] In other cases, following the Circuit's decision in *Brock*, the government has asked the Court to depart upward under Section 5K2.7 (Disruption of Governmental Function), and/or Section 5K2.6 (Weapons). The government is not advocating for such departures here, because the parties agreed under the terms of the plea agreement to not advocate for any upward or downward departures outside of the departure for substantial assistance to law enforcement. ECF 427 at 4.

    (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

    (3) the nature and extent of the defendant's assistance;

    (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

    (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

Here, the second and fifth factors clearly apply and can be quickly addressed. Shortly after he was arrested by law enforcement, Dolan reached out through counsel and expressed his desire to plead guilty and cooperate, and he has been cooperating with law enforcement ever since. Dolan has debriefed extensively with the government and pled guilty as soon as he was afforded the opportunity, becoming the fourth person to plead guilty to a conspiracy offense related to the January 6 attack on the Capitol. That plea was pursuant to a cooperation plea agreement that Dolan agreed to be made public. Dolan then testified before the grand jury and later testified at the trial against the leaders of the conspiracy in *United States v. Rhodes, et al.*, 22-cr-15-APM. In other words, Dolan's cooperation was extremely timely. U.S.S.G. § 5K1.1(a)(5).

Dolan's cooperation has also been truthful, complete, and reliable. Much of the information he provided has been corroborated by other witnesses and objective evidence such as messages, video, photographs, and other data recovered from his phone, from public source information and articles, and from the devices and accounts of others recovered by law enforcement during this investigation. In other words, the second factor listed above also supports a finding of substantial assistance by Dolan. U.S.S.G. § 5K1.1(a)(2).

11

With respect to the significance, usefulness, nature, and extent of Dolan's assistance (the first and third factors), Dolan turned over to law enforcement photographs and videos from January 6, 2021 that he had deleted from his phone but preserved elsewhere. Those photographs captured Dolan and his co-conspirators participating in the attack on the Capitol and were ultimately used by the government as exhibits at trial. Dolan's trial testimony was incredibly impactful. He was able to give context and meaning to scores of messages that he and his co-conspirators exchanged in the weeks between the election and the certification. Most notably, Dolan made clear that when Rhodes told the conspirators that "if [the president] fails to act, then we will," the conspirators understood Rhodes was talking about the certification of the election: "If he didn't do it, then we would need to step up and stop the certification of what I saw—I don't want to put words in his mouth—but what I saw as an illegitimate election. So the certification process would still have to be stopped." 10/18/22PM Tr. at 4110. And Dolan linked the QRF to this mission of stopping the certification of the election: "[W]e would have a QRF, quick reaction force, ready to go get our firearms in order to stop the election from being certified within Congress." *Id.* at 4109. Finally, through his testimony of the concept of the commander's intent, Dolan was able to explain why, even though Rhodes never directly ordered him to attack the Capitol on January 6, 2021, participating in the attack was consistent his agreement to stop the certification of the election by any means necessary. 10/18/22PM Tr. at 4109-10. In sum, Dolan's cooperation has been incredibly significant, useful, and extensive. U.S.S.G. § 5K1.1(a)(1), (3).

This cooperation was not without risks. As mentioned above, Dolan was among the first members of this conspiracy to plead guilty, and he did so pursuant to a public cooperation plea agreement, in a case that has garnered significant national interest and, sadly, controversy. Dolan

12

then testified against the leaders of the conspiracy, identifying several of them in court. This took courage on Dolan's part. And it triggered backlash. Dolan was one of several cooperating defendants to receive threatening mail over the summer of 2021. Law enforcement was not able to identify the source of the mailings, and fortunately no violence came of the threats, but they understandably shook Dolan and his family. This Court should give Dolan credit for the danger and risk of injury to himself and to his family that resulted from his cooperation in this case. U.S.S.G. § 5K1.1(a)(4).

Taking all of these factors into account, a seven-level downward departure would reduce Dolan's adjusted offense level by about 47 percent from the government's estimated final adjusted offense level of 15, which he would have faced absent his cooperation in this matter. The government submits that such a reduction appropriately reflects the principles outlined above that this Court should consider in assessing the level of assistance Dolan provided to law enforcement.

### C.  Sentencing Guidelines Recommendation

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. ECF 1097 at ¶ 32. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at level 8, the defendant's Guidelines range is 0 to 6 months' imprisonment. Because level 8 is in Zone A of the Guidelines, the Court may impose a probationary sentence. U.S.S.G. §§ 5B1.1(a)(1), 5C1.1(b). In other words, a sentence of three years of probation, with a requirement of restitution and community service, among other conditions, would be a Guidelines-compliant sentence at level 8.

## VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance,

the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A. Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Dolan's conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a Constitutional crisis. Perhaps even more alarmingly, these actions were not spontaneous for Dolan and his co-conspirators—they were in furtherance of a conspiracy hatched weeks earlier to take any means necessary, up to and including the use of force, to stop the lawful transfer of power from Donald Trump to Joseph Biden by obstructing Congress' certification of the Electoral College vote. Dolan came to D.C. understanding the potential for, and in many ways hoping to participate in, a forcible interruption of the certification of the election. He wanted to fight and knew his group had brought weapons to support the effort. And Dolan ultimately joined the violent mob that breached the Capitol in furtherance of this conspiracy. The nature and circumstances of Dolan's offense were of the utmost seriousness, and fully support the government's recommended sentence.

### B. The History and Characteristics of the Defendant

At the time of this offense, Dolan was employed part-time, helping in the daycare his wife ran from their home. He had no criminal history. In other words, Dolan's crimes on January 6 were an isolated incident in an otherwise law-abiding life.

14

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a significant period of probation, with conditions such as restitution, as part of the defendant's sentence. Dolan's criminal conduct on January 6 was the epitome of disrespect for the law. At the same time, Dolan has fully accepted responsibility for this offense, explaining during his trial testimony that he pled guilty because "I talked about my desire and, I guess, wanting to stop what I saw as an illegitimate government or not duly elected government there in taking power. So to, I guess, in a way to durther that end, I threw my rifle and pistol in the car, I helped bring people up there, and, ultimately, ended up on the steps of the Capitol, moving into the Capitol Building to try and get Congress to stop the certification of the election of President Biden." Such a matter-of-fact, complete, and public acceptance of responsibility helps to promote respect for the law, as would a sentence that takes into account the steps Dolan has taken to cooperate with this investigation and to make amends for his offenses.

### D. The Need for the Sentence to Afford Adequate Deterrence

Because of the unique circumstances of this case, a probationary sentence is appropriate "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] At the same time, early and public acceptance of responsibility, coupled with his cooperation with law enforcement, is something that should be rewarded, to encourage

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

15

others to take similar responsibility for their conduct on January 6. For these reasons, a lengthy probationary sentence achieves the goal of general deterrence.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. The government is recommending a Guidelines-compliant sentence, should the Court apply the government's recommended departure for substantial assistance to law enforcement.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

16

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). The government's recommended sentence does not create unwarranted disparities in consideration of the substantial assistance the defendant has provided to law enforcement, the risk to his and his family's safety that it has caused, and his complete and public acceptance of responsibility for his conduct.[4] Moreover, the government's recommended sentence is consistent with the sentence the government requested, and the Court imposed, in the related case of *United States v. Caleb Berry*, 21-cr-460-APM, which is the best comparator to Dolan's case.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

17

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Here, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Dolan must pay $2,000 in restitution.[6] ECF 427 at 10. As the Presentence Report reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. ECF 1100 at ¶13, n.3. For the reasons outlined in greater detail in the restitution brief submitted in the related *Rhodes* matter, *see* Case No. 22-cr-15, ECF No. 654, which the government incorporates by reference, the government submits that $2,000 represents an appropriate and proportional amount of restitution for Defendant Dolan to pay.

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of three years of probation, with the special conditions that the defendant perform 120 hours of community and pay $2,000 in restitution and the mandatory $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: _____
Kathryn L. Rakoczy
D.C. Bar No. 994-559
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W., Room 5.236
Kathryn.Rakoczy@usdoj.gov